**John PHILLIPS, Appellant and Cross-Appellee,**

v.

**The EVENING STAR NEWSPAPER CO., Appellee and Cross-Appellant.**

**Nos. 13230, 13231.**

District of Columbia Court of Appeals.

Argued March 15, 1979.

Decided Nov. 17, 1980.

---

Joseph Zitomer, Silver Spring, Md., for appellant and cross-appellee John Phillips.

Stuart F. Pierson, Washington, D. C., with whom Richard L. Cys and Floyd H. Lewis, Washington, D. C., were on the brief, for appellee and cross-appellant The Evening Star Newspaper Co., Inc.

Sidney Dickstein and Leslie J. Ruben, Washington, D. C., filed a brief on behalf of amicus curiae, Ilya Wolston.

Before KERN, HARRIS and FERREN, Associate Judges.

KERN, Associate Judge:

These are cross-appeals from orders the trial court entered in a defamation suit John Phillips brought against the Washington Evening Star (Star) that resulted in the jury finding in his favor with a verdict in the amount of one dollar. Phillips appeals from the court's denial of his motion for a new trial, contending that there was sufficient evidence of punitive damages. We are not persuaded by this argument and conclude the court correctly instructed the jury and properly denied the new trial motion.[1]

The Star vigorously challenges on its appeal the court's denial of its pretrial motion for summary judgment and its motion for a directed verdict at trial. It contends that Phillips, a private individual, was involved in an event of public or general concern warranting its report in the newspaper. Hence, Phillips may not recover, according to the Star, for defamation in a news story unless he shows by clear and convincing evidence that the Star published the defamatory material with knowledge that it was false.[2] Alternatively, the Star argues that its publication concerning Phillips was privileged because it accurately reported an official pronouncement concerning a governmental activity taken in response to action by Phillips.

We conclude that the trial court was correct in ruling that (1) pursuant to the Supreme Court's holding in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), an individual in a defamation action who is neither a public figure nor a public official may recover actual damages if he shows negligence on the part of the media defendant, and (2) no common law privilege was applicable to the instant case. The trial court's opinion reviews the pertinent precedents and states both clearly and correctly the conflicting policy considerations it examined in reaching its conclusions. While we might structure our analysis somewhat differently than did Judge Revercomb, we share his conclusion and adopt his learned opinion as our own.

One aspect of the opinion by Judge Revercomb warrants follow-up comment. He discussed (*infra* at p. 86) an opinion by Judge Newman, then a Superior Court trial judge, which reached the contrary result. That brief unpublished opinion was issued in *Hatter v. The Evening Star Newspaper Co.*, CA No. 8298–'75 (Mar. 15, 1976). Subsequent to the issuance of Judge Revercomb's opinion, both his opinion in this case and Judge Newman's opinion in the *Hatter* case were commented upon in footnotes by the United States Court of Appeals for the District of Columbia Circuit and by the Supreme Court. Both references at least implicitly—and arguably explicitly—endorse Judge Revercomb's opinion in this case, and reject the position taken in *Hatter*. See *Wolston v. The Reader's Digest Association, Inc.*, 188 U.S.App.D.C. 185, 193 n. 3, 578 F.2d 427, 435 n. 3 (1978), *rev'd*, 443 U.S. 157, 160 n. 2, 99 S.Ct. 2701, 2704, n. 2, 61 L.Ed.2d 450 (1979).

We make one further comment before setting forth Judge Revercomb's careful analysis. We are somewhat puzzled by the extent of our dissenting colleague's reliance upon the philosophy of, and excerpts from, the plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). There is no question in our minds but that in *Gertz v. Robert Welch, Inc., supra*, the Supreme Court rejected the earlier plurality opinion in *Rosenbloom* (as, indeed, is partially recognized by

---

1. Appellant Phillips also attacks the propriety upon the evidence in this case of the jury's nominal award to him. We are satisfied under the circumstances that there was no error here requiring reversal and retrial.

2. The trial court ruled at the conclusion of the evidence that actual malice or reckless disregard of the truth on the part of the Star had not been shown.

our colleague). Illustratively, the Court stated in *Gertz*:

> For these reasons we conclude that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual. The extension of the *New York Times* [*v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable. 418 U.S. at 345–46, 94 S.Ct. at 3010.

Thus, our colleague's preference for effectively equating private individuals with public figures for defamation purposes strikes us as not only contradictory to historical common law principles, but to *Gertz* as well.

For the reasons set forth herein and in the following opinion by Judge Revercomb which we adopt, the rulings and judgment appealed from are affirmed.

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

C.A. No. 9999–75

JOHN PHILLIPS, PLAINTIFF,

v.

THE EVENING STAR NEWSPAPER COMPANY, DEFENDANT.

### OPINION AND ORDER

■ This case comes before the Court on Motion for Summary Judgment filed by the Defendant, The Evening Star Newspaper Co. ("Star").[1] Plaintiff John Phillips has sued the Star for defamation in connection with a newspaper article it published on November 29, 1974, which in reporting what in fact was an accidental shooting stated falsely that Phillips had shot his wife "during a quarrel." The Star claims its source of the defamatory report was a recorded police "hot line" dispatch received over the telephone. The Star's Motion raises important questions concerning the constitutional and common law privilege of the news media to publish "news" articles in the District of Columbia defamatory to private citizens.

### UNDISPUTED FACTS

The facts in this case which do not appear in genuine dispute are as follows.[2]

On November 28, 1978, in the late evening hours, Fannie Lou Phillips' life ended abruptly in the basement of her home as a result of a gunshot wound to her neck. John Phillips, her husband, who was the only person at the scene of the shooting and who called the police, was arrested that evening for the homicide despite his statement that he had "accidentally shot (his) wife" when his pistol accidentally fell from its holster and discharged on contact with the floor. John Phillips, incidentally, was not a public official nor, in any sense of the word, a public personality; he was a private citizen at the scene of the shooting incident.

Acting on information received by telephone from a police public information offi-

---

1. The Star originally filed its potentially dispositive Motion for Summary Judgment on May 28, 1976. Such a Motion, early in the case, is particularly appropriate in defamation actions against media defendants where "chilling" of the freedom of press and speech is threatened. *Washington Post Co. v. Keogh*, 125 U.S.App. D.C. 32, 365 F.2d 965 (1966), *cert. den.*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). However, in consideration of the policy of SCR-CIV 56(f) which favors determination of such dispositive motions only when full discovery of material facts is available to the non-moving party, the Court continued the Motion for hearing until May 9, 1977, to enable Plaintiff's counsel more than ample opportunity for discovery. Wide latitude was permitted Plaintiff during its discovery efforts and, indeed, Plaintiff's liberal discovery continues past the date of hearing Defendant's Motion.

2. In consideration of the material submitted in support of Star's Motion for Summary Judgment, material submitted in opposition, and full oral argument on the motion, the Court must determine whether any factual controversy pertinent to the controversy exists and must in making this determination view the material in the light most favorable to the opposing party. *International Underwriters, Inc. v. Boyle*, 365 A.2d 779 (1976).

cer over a recorded one-way "hot line"[3] dispatch and supplemented by his own tele-phone inquiries, Charles McAleer, a reporter employed by the Star, composed a "hot" news article concerning the Phillips shoot-ing incident. He combined this incident with another death and arrest incident for a news story carried in the second edition of the November 29, 1974, *The Washington Star News* (now known as *The Washington Star*). The pertinent part of the article read as follows:

### D.C. WOMAN, MAN SHOT DEAD

D.C. police said a 49-year-old Northeast woman and a 32-year-old Southeast man were killed in separate shooting incidents within a two hour period last night.

Fannie Lou Phillips of the 2600 block of Randolph Street NE was shot once in the head with an automatic pistol during a quarrel in her home, police said. She was pronounced dead at 1:45 a. m. at the Washington Hospital Center, according to police.

Mrs. Phillips' husband, John, 56, who called the police, has been arrested and charged with homicide, police said.

The "hot line" log which is supposed to reflect verbatim the messages transmitted orally by telephone to the news media con-tains this entry in respect to the Phillips incident:[4]

At about 11 o'clock last night Fannie L. Phillips 49, of 2911 Randolph Street N.E. was shot once during an argument with her husband, John Phillips 56, inside their apartment. Mrs. Phillips was taken to the Washington Hospital Center where she was pronounced nead (sic) at 1:45 this morning. Her husband has been arrested and charged with Homicide.

On November 30, 1974, the *Washington Post* published an article on the shooting incident using the "during an argument" statement. The *Washington Post* is also a subscriber to the "hot line".

The Phillips case was later reclassified by police from a homicide to an accidental shooting, the police, after investigation, de-termining that no homicide had taken place. The arrest book was corrected, court papers dissolved, office files changed and other notifications made, as reflected in the Sup-plemental Police Report of December 19, 1974. (Attachment M, Greene affidavit filed August 2, 1976).

There is question as to the actual source and factual basis for the *"during a quarrel"* assertion in the article, based upon the "hot-line" "during an argument" state-ment—there is no basis in the present rec-ord for such an assertion. None of the official police reports, including the PD 251, PD 255, PD 163, PD 123, PD 668, PD 119, and John Phillips' formal statement to Po-lice, as reflected in Detective Greene's affi-

3. The "hot line" is a telephone communication system established by the Public Information Office of the D.C. Police in 1971 as a means of providing reports about crimes and police ac-tivities to the media. There is no charge for this system to the various subscribers, some 18 in total including the Star, the media merely paying for the costs of equipment. Whenever an event occurs which the police information officer deems newsworthy, he prepares a hand-written or typewritten narrative report and then transmits orally this information to the subscriber, activating a flashing light atop the "hot line phone" and playing a recorded mes-sage to the answering reporter on duty. The information from which the hot line report is assembled is obtained by the public informa-tion officer directly from the police unit in-volved, i. e. homicide in the instant case. The written narrative is placed in a loose leaf "log" book made available to members of the press

who on many occasions remove pages to take to their offices or to make photostatic copies.

4. Plaintiff contests the authenticity of the "hot line" log entry with respect to this incident, suggesting that it was changed at some time subsequent to the newspaper publication to reflect "during an argument" which did not originally appear in it. However, speculation and surmise without supportive evidence is not sufficient to raise a genuine issue of fact re-garding the authenticity of the hot line log and this Court must assume such authenticity in absence of concrete particulars. The Court does note that in the companion story printed by the Star with the Phillips article, concerning the slaying of one Lawrence Boydston, the Star reported that Boydston was shot "during a quarrel". However, the "hot line" log account of this incident contains no reference to any "argument", "quarrel", or the like.

davit (the homicide detective on the Phillips case) filed August 2, 1976, reflect any such quarrel or domestic unrest in connection with the shooting; nor did the *press release* issued on November 29, 1974, by the Homicide Branch (attachment H, Greene affidavit filed August 2, 1976) mention any quarrel or marital discord in reporting the incident. Nor does it appear from the numerous affidavits filed by members of the Homicide Branch that any of them were the source of such "quarrel" information. It should be noted that PD 251 is treated for purposes of D.C.Code 1973, §§ 4–134(4), 4–135, as equivalent to the arrest book information available to the public; however, such information is not customarily available for a day or two (Page 5, Greene affidavit filed August 2, 1976). This delay, the Star represents, makes the news "stale" in the eyes of the public, and the news media is correspondingly pressed to expeditiously report such news items as the Phillips shooting.

On the basis of the "during a quarrel" statement in the Star article, the Plaintiff filed the instant suit. He alleges in separate counts negligent and malicious publication and asserts damages including humiliation, embarrassment and a disabling stroke, praying for $500,000 compensatory and $500,000 punitive awards.

Defendant Star concedes, for purposes of this motion, that Plaintiff is not a public figure; indeed, this seems clear in light of recent Supreme Court decisions on the subject. *See e. g., Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Furthermore, for purposes of this motion, the Star does not seriously contest the defamatory impact of the statement "during a quarrel" on the Plaintiff allegedly imputing both marital discord and consequent criminal shooting. It appears that such a statement can only be reasonably interpreted as defamatory in the context in which it was used "since it imputes 'conduct that would render him liable to punishment or make him odious, infamous or ridiculous' ". *Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (D.C.App.1970), *citing Chaloner v. Washington Post Co.*, 36 App.D.C. 231 (1911),

*rev'd on other grounds*, 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1919); *see also Thackrey v. Patterson*, 81 U.S.App.D.C. 292, 157 F.2d 614 (1946) (mere assertion of marital discord held libelous).

In its Motion for Summary Judgment, the Star raises four defenses: (1) constitutional privilege under the *New York Times* "actual malice" standard; (2) privilege to publish the article as an accurate restatement of a public record; (3) privilege to report the fact of plaintiff's arrest; and (4) no provable damages under applicable standards of publisher's culpability.. In short, the Star asserts its privilege to rely on police dispatches over a one-way telephone information system in publishing false factual statements defaming private citizens, in absence of knowing or reckless publication. There being no evidence of common law malice (ill will) or knowing or reckless publication in the undisputed facts, the Court agrees that if such a common law or constitutional *Times* privilege applies to this publication, the Motion for Summary Judgment should be granted.

However, should a negligence or "higher" standard of care apply, there is a sufficient question of fact raised as to the reasonableness of the Star relying on the "hot line" dispatch to deny summary judgment. Therefore, the issue for the Court to determine is whether a constitutional or common law privilege applies to the Star's defamatory publication, lowering the standard of care required of the Star in publishing the defamatory news article at issue.

## CONSTITUTIONAL PRIVILEGE

The states have long protected the important reputational interests of its citizens in following the strict liability common law of defamation. Recognizing the harsh results of such strict liability when publication is made in the furtherance of some other competing interest or policy consideration, the states softened and tempered the strict liability standard with privileges, both absolute (actually immunities) and conditional; however, defamation remained basically a

strict accountability proposition regardless of the innocence of the publication. The Courts of the District of Columbia in *Chaloner v. Washington Post Co.*, 36 App.D.C. 231 (1911), followed this policy of protection of reputational interests in the case of newspaper publications, stating:

> Society can in no way be benefitted by the publication of libelous matter. In view of the constitutional protection afforded a free press, publishers should be held to the highest accountability for unreliable publications, or such as tend to impute to any person conduct that would render him odious, infamous, or ridiculous. The parties under such circumstances are not dealing at arm's length. While the individual assailed is refuting the false charges to one person, the publication is reaching thousands, thus placing the helpless victim completely within the power of his traducer. *Id.* at 233.

Starting in 1964, however, the U. S. Supreme Court, faced with adjusting the tensions between reputational interests on the one hand and freedom of speech and press on the other, revolutionized the common law tort system with regard to defamation, striking new balances in favor of the mass media.

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court created a narrow constitutional privilege in the case of certain publications. In that case, the Court held that the first amendment umbrella protects a newspaper from liability for defamatory reports about *official conduct* of a *public official* (a local police chief), unless there is presented clear and convincing evidence of the knowing or reckless falsity of the newspaper's account—"actual malice". The Court later clarified "actual malice" to mean "no honest belief in the truth of the

statement", in effect, "scienter", making clear that ill will, improper motive, spite or desire to do harm for its own sake, all constituting common law malice, was not sufficient. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Henry v. Collins*, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965). The Supreme court soon extended this constitutional privilege, commonly known as the *Times* privilege, to all public officers and employees, no matter how inferior, in the context of an impersonal attack on government operations. *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In 1967, the Court extended the *Times* privilege to newspaper articles concerning the conduct of *public figures* not fitting the public officials definition. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (college football coach); *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (retired army general). Unofficial conduct and activities of officials were enveloped by the growing *Times* privilege shelter in 1971. *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971) (past perjury of a candidate); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) (past bootlegging activities of a candidate). The zenith of extension of the *Times* privilege, protecting the press at the expense of reputational interests, came in a badly splintered Supreme Court decision in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). In that case the U. S. Supreme Court, in a plurality opinion, stretched the *Times* privilege beyond the official and unofficial conduct of public officials and public figures to protect news media reports of events of public interest.[5] The Supreme Court shifted the

---

**5.** This extension was perhaps foreshadowed by the Supreme Court's decision in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), an invasion of privacy case, which held in a divided opinion that the *Times* privilege extended to reporting of matters of public interest. This decision promoting a "newsworthy" test for application of the *Times* privilege was severely criticized by the commentators for its bootstrapping propensities (i. e., if sufficiently publicized, the event will arouse public interest) and it was argued that such a test should not cross to the action for defamation, especially considering the *Hill* Court's cognizance that the "additional state interest in the protection of the individual against damage

privilege applicability analysis, at least in practical respects, from the status of the defamed plaintiffs to the nature of the event reported in order to determine whether the occasion deserved the special *Times* protection. *But see* 88 Harv.L.Rev. 142–143, which finds the *New York Times* through *Rosenbloom* decisions consistent under Justice Brennan using public importance of the utterance as a touchstone for invoking the privilege.

This public interest-newsworthy test in actions for defamation, however, was soon repudiated by the Supreme Court.[6] In *Gertz v. Robert Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court reassessed the constitutional restraints on state law of defamation. Again faced with balancing the competing values of freedom of speech and press with the "strong and legitimate state interest in compensating private injury to reputation," 418 U.S. at 348, 94 S.Ct. at 3011, the Court rejected the *Rosenbloom* public issue test for availability of the *Times* privilege as over-emphasizing the interests of the press at the expense of important private reputation interests. As the Court stated, "The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree we find unacceptable" 418 U.S. at 346, 94 S.Ct. at 3010. The *Gertz* Court, apparently uniting behind Justice Harlan's dissent in *Rosenbloom*, rejected the *Rosenbloom* analysis based upon the content or category of the speech, distinguishing the pre-*Rosenbloom* cases extending the *Times* privilege. The Court focused instead on the status of the defamed Plaintiff in terms of opportunity for rebuttal, and, the more important consideration, existence of self-induced publicity and "assumption of the defamation risk." *See id.* at 344, 345, 94 S.Ct. at 3009. The *Gertz* Court recognized that a person who has not sought publicity and

who would have little access to the media for rebuttal should have greater protection than a public figure. Thus, after *Gertz*, it is the public figure—private individual dichotomy which is to regulate the applicability of the constitutional privilege, the *Times* hurdle, to cases involving media defamation.

It should be noted that the Supreme Court, in rejecting the *Rosenbloom* "public interest" test, questioned the test's underlying wisdom and propriety as a tool for protecting the interests involved. Beyond its bootstrapping appeal, the *Gertz* Court found difficulty in forcing judges to decide on an *ad hoc* basis which publications address issues of "general or public interest" and which do not, to determine "what information is relevant to self government", and doubted the wisdom of delegating such a task to the conscience of judges. *Id.* 418 U.S. at 346, 94 S.Ct. at 3010, citing *Rosenbloom*, 403 U.S. at 79, 91 S.Ct. at 1837 (Justice Marshall). The Court also observed that such a public interest test overly exposed the press to liability as well as impermissibly denied any recourse to the private individual whose reputation is injured by defamatory falsehood unless he met the "rigorous requirements of *New York Times* ...." 418 U.S. at 346, 94 S.Ct. at 3010.

In striking a final constitutional balance between these competing interests, the *Gertz* Court held the following limitations were mandated by the Constitution in suits against the news media:

1) The *Times* wilful or reckless falsity standard of liability applies only to defamation of public officials or public figures;

2) Even for the defamation of a private individual, the states may not impose a rule of strict liability upon the mass media (rejecting common law strict liability as to the media);

---

to his reputation would be involved". 385 U.S. at 391, 87 S.Ct. at 543; *See* Note, *The Invasion of Defamation by Privacy*, 23 Stan.L.Rev. 547 (1971).

**6.** It should be noted that the Supreme Court has intimated that it may wish to reconsider and repudiate the *Hill* newsworthy standard for invasion of privacy actions as well. *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974).

3) Where defamatory impact of a statement is apparent, the states have latitude to protect a private individual by any standard of care except strict liability without fault;

4) Regardless of whether plaintiff is a public or private figure, punitive or presumed damages can be recovered only if reckless or knowing falsehood is proved;

5) Under any lesser standard of culpability (e. g. negligence), the private individual is limited to recovery of compensation for "actual injury" which encompasses all usual tort damages including humiliation and suffering.

Thus the *Gertz* Court left the States free to impose liability on the media for actual damages on the basis of negligent conduct where the Plaintiff was "no moth rushing to the flame", but instead a private person without status for adequate rebuttal. As Justice Marshall observed in a footnote in *Rosenbloom*, leaving the states free to so impose liability for the media's negligent defamation in their evolution of the common law . . .

> . . . should make it somewhat more likely that a private person will have a meaningful forum in which to vindicate his reputation. If the standard of care is higher (than *New York Times*), it would seem that publishers will be more likely to assert the defense of truth than simply contend that they did not breach the standard. 403 U.S. at 86, 91 S.Ct. at 1840.

■ The constitutional restrictions do mandate, however, that so far as presumed or punitive damages are concerned, the Plaintiff must meet the *Times* standard of reckless or knowing falsehood; as observed above, the evidence in this case completely fails to meet this standard. Summary judgment as to presumed and punitive dam-

ages claimed by Phillips must therefore be granted the Defendant Star. Remaining to be determined is the Plaintiff's claim for actual damages. To resolve the issue of which standard of care should be applied to the Star for liability for such actual damages, the Court must turn to the defamation law in the District of Columbia, as modified by the constitutional limitations announced in *Gertz*.

## DISTRICT OF COLUMBIA LAW

■ Defendant Star concedes that under *Gertz* the standard of care, or, to approach from another perspective, the standard of fault, is left to the States where actual injuries are claimed as a result of media defamation—the only limitation is that strict liability may not be imposed. Technically, no constitutional privilege is involved in setting such standards for actual compensation of the victim except the privilege not to be held strictly liable. The Star does assert, however, that this Court has already decided the issue left open by *Gertz*, the standard to be applied in compensating media defamation wrongs, in a Superior Court trial judge's opinion in *Hatter v. Evening Star Newspaper Co.*, CA 8298–75 (dated March 15, 1976). That case concerned a private plaintiff defamed in a media publication and was decided in light of *Gertz*.[7] The Star asks that this decision be followed in the instant case, in effect resurrecting a *Rosenbloom* rule for the District of Columbia.

■ There appears, however, to be some ambiguity in the opinion besides the lack of cited case authority to support the proposition the Star claims it supports. The trial judge also specifically held in the *Hatter* decision that there was no showing that the defendants published the article *negligently*, thus not necessarily deciding the standard to be applied. This Court also is not

7. In the *Hatter* case, the trial judge stated without citation to D.C. authority:

This Court concludes that the appropriate rule in this jurisdiction should be, and is, that a private individual involved in a matter of public concern may not recover in libel against a publisher, reporter or broadcaster who reports or comments on that matter, unless he proves by clear and convincing evidence that the defendants have violated the "actual malice" standard set forth in *New York Times Company v. Sullivan*, 376 U.S. 256 [254, 84 S.Ct. 710, 11 L.Ed.2d 686] (1964).

clear on whether the standard arguably held applicable by the Court in *Hatter* was found by reason of a common law privilege, such as fair comment (as apparently all facts reported in the article were true—only opinions were arguably false) or whether it was based on an unexpressed policy consideration. In view of this ambiguity in the opinion and the real policy problems associated with public interest standard possibly suggested by *Hatter*, including the bootstrap aspect of a newsworthy standard as well as the cogent concerns expressed by the Supreme Court in *Gertz*, this Court cannot "follow" *Hatter* and "create" a common law *Times* actual malice standard for media publications of matters of public concern where private individuals and their reputations are actually damaged. The established common law of defamation as restricted by the *Gertz* prohibition on strict liability must be followed to set an appropriate standard of liability.[8]

■ The common law of defamation in the District of Columbia has long sought to provide the defamed Plaintiff a maximum standard of protection, strict liability, that is to say the "ultimate" standard of care. As stated above, this strict liability was tempered by certain recognized privileges, but the basic policy to protect private reputations remained in the absence of important offsetting considerations. In light of the *Gertz* constitutionally mandated prohibition of strict liability for media defamation defendants, the District of Columbia must abandon its basic defamation standard of care and liability; however, its utmost protection policy remains intact. Therefore, the basic standard of care in the District of Columbia for media defamation of private individuals, so far as actual damages are involved, becomes translated by *Gertz* from strict liability to its next most proximate standard of care—that of negligence. *See also Time, Inc. v. Firestone, supra.* The standard thus applicable to the Star's defamation of Phillips, insofar as actual damages are alleged, is negligence, *unless* a common law privilege applies. For reasons stated below, the Court finds no common law privilege sheltering the Star from the negligence standard.

■ There are many common law privileges recognized in the District of Columbia law of defamation, composed of absolute privileges such as those enjoyed by judges or legislators in the course of their official conduct and conditional or qualified privileges, true "privileges" arising out of the particular occasion upon which the defamation is published and defeated upon a showing of malice. The Defendant Star, not eligible under the absolute immunity category of privilege, must rely on a defeasible qualified privilege. The District of Columbia basically recognizes in the case of the media two occasions for a qualified privilege to defame when a public official is not involved. Although muddled in the case law and intermingled in several opinions, these privileges distill to "fair comment on matters of public interest" and "reports of official proceedings and public meetings". *See, e. g., De Savitsch v. Patterson,* 81 U.S.App.D.C. 358, 159 F.2d 15 (1946) (which confusingly .intermixes the fair comment privilege with the official records privilege); *see also Johnson v. Johnson Publishing Co.,* 271 A.2d 696 (D.C.App.1971) (in which the trial judge erroneously instructed on fair comment).

---

**8.** The Court, at this point, must also reject any privilege of constitutional dimension flowing from the reporting of an "official record" (assuming this "hot line" to be such) which the Star asserts flows from *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). That case, involving an invasion of privacy action in the publication of *true* information from official court records the (identity of a deceased rape victim), is clearly distinguishable from the present defamation action. Furthermore, the Supreme Court recently repudiated and rejected such an extension of *Cox* to the defamation constitutional privileges calculus, warning that such extension would give rise to the same problems created by the rejected *Rosenbloom* approach. *Time, Inc. v. Firestone, supra,* 424 U.S. at 455–56, 96 S.Ct. at 965–966. Common law privilege, if any, is the sole protection from basic standards of defamation liability to be accorded media publishers of public records involving private individuals.

■ The District of Columbia has long recognized and accorded the media the privilege of fair comment on matters of public interest. The policy considerations which prompted a *Rosenbloom* decision to protect reports of matters of public interest no doubt gave rise to this privilege in the common law. This privilege, however, has been restricted to extend protection only to opinion, not to misstatements of fact. At least since 1936, D.C. Courts have rejected the minority view which allows "fair comment" on misstatements of fact as well as opinion, absent malice, and have followed the majority view of three-quarters of the states in disallowing the fair comment privilege where facts are false. *Washington Times Co. v. Bonner*, 66 App.D.C. 280, 86 F.2d 836 (1936) *citing Russell v. Washington Post Co.*, 31 App.D.C. 277 (1908); *accord, Fisher v. Washington Post Co.*, 212 A.2d 335 (D.C.App.1965). *See also Hughes v. Washington Daily News Co.*, 90 U.S.App.D.C. 155, 193 F.2d 922 (1952). The policy rationale for this rule is well stated in *De Savitsch v. Patterson, supra*, 81 U.S.App.D.C. at 360, 159 F.2d 15:

> To state accurately what a man has done, and then to say that in your opinion such conduct was disgraceful or dishonorable, is comment which may do no harm, as every one can judge for himself whether the opinion expressed is well founded or not. Misdescriptions of conduct, on the other hand, only leads to the one conclusion detrimental to the person whose conduct is misdescribed and leaves the reader no opportunity for judging himself for (sic) the character of the conduct condemned, nothing but a false picture being presented for judgment.

It is clear, therefore, that given the defamatory statement of fact made in this case of the "during an argument" assertion, the privilege of fair comment as recognized in the District of Columbia is not available to the Star. Although under this privilege the Star was certainly protected in reporting the true fact of Mr. Phillips' arrest, and, indeed, would have been protected in expressing an opinion relative to it (in the absence of malice), there was no "fair comment" privilege to print the additional false fact of the existence of a quarrel.

■ Nor may the Star avail itself of the protection afforded by the other media common law privilege, that of reporting "official proceedings and public meetings", although the Court concedes this to be a closer question. A contemporary statement of this common law privilege to report official proceedings is as follows:

> Defamatory matter concerning another in a report of any official proceeding or any meeting open to the public which deals with matters of public concern is published on a conditionally privileged occasion if the report is (a) accurate and complete, or a fair abridgement of what has occurred, and (b) published for the purpose of informing the public as to a matter of public concern.

Restatement (Second) of Torts, § 611 (Tent. Draft No. 20, 1974). Misstatements of fact as well as opinion are protected under this reporting privilege. The privilege has been held applicable to reports of proceedings before any court, or agency of the court (e. g. a grand jury returning an indictment), reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies (e. g. an extradition hearing before the governor), and to reports of action by legislative bodies and reports of bodies which are by law authorized to perform public duties (e. g. bar association disciplinary proceedings), as well as reports of any official proceeding or action taken by any officer or agency of government. Restatement (Second) of Torts, § 611, Comment d (Tent. Draft No. 20, 1974). That such a privilege is recognized in the District of Columbia is well established, but there was doubt expressed in early cases whether the privilege extended beyond judicial proceedings and records, and even as to those matters, whether some affirmative "official act" was necessary before they were privileged. *Washington Times Co. v. Bonner, supra*, 66 App.D.C. at 284, 86 F.2d at 840 (recognizing the privilege to report judicial proceedings, but finding no authority to extend it to proceedings

before an executive department or officer); *Fletcher v. Evening Star Newspaper Co.,* 72 App.D.C. 303, 114 F.2d 582 (1940), *cert. den.* 312 U.S. 694, 61 S.Ct. 732, 85 L.Ed. 1130; *Lubore v. Pittsburgh Courier Pub. Co.,* 101 F.Supp. 234, *aff'd* 91 U.S.App.D.C. 311, 200 F.2d 355 (1952) (no privilege to report judicial proceedings until official action by the magistrate or court); *Wills v. Jones,* 13 App.D.C. 482 (1898). The District of Columbia Courts appear to have later accepted an expansion of the reporting privilege beyond the bounds of strictly judicial proceedings, though possibly not as far as the Restatement indicates, and have repudiated the "official act" requirement for the privilege to apply. *Cf. De Savitsch v. Patterson, supra; Hughes v. Washington Daily News Co.,* 90 U.S.App.D.C. 155, 193 F.2d 922 (1952); *Johnson v. Johnson Publishing Co., supra* at 698 (following the minority rule that qualified privilege attaches before judicial action is taken). The Star in asserting the privilege based upon its reliance on the "hot line" as an official report or statement from the police clears two major hurdles in the privilege by its fair and accurate report of the hot line information in its article and by proper attribution of the article's statements to police sources (avoiding the legal characterization of the statements as being those of the Star as opposed to those of the asserted "official" report). See *Johnson v. Johnson Publishing Co., supra* at 698, citing *Washington Times Co. v. Hines,* 55 App.D.C. 326, 5 F.2d 541 (1925) and *Washington Times Co. v. Bonner, supra* (fair and accurate standard); *Hughes v. Washington Daily News, supra,* and *Curtis Publishing Co. v. Vaughan,* 107 U.S.App. D.C. 343, 278 F.2d 23, *cert. den.* 364 U.S. 822, 81 S.Ct. 57, 5 L.Ed.2d 51 (1960) (attribution required). However, the Star's reliance on the "hot line" log as an official document to provide occasion for the official report privilege is misplaced and incorrect. This log representing the oral police communication from which the Star composed its article does not carry the dignity and authoritative weight as a record for which the common law sought to provide a reporting privilege. Mere inaccurate business records of some sort, even if the hot line log could gain that status, will not suffice to create an official record to which the reporting privilege will attach. In fact, the log represents little more than an informal arrangement between the police and the media, a joint venture, which consists of nothing more sanctified than unofficial statements of police regarding a crime. As to the reach of the reporting privilege to police statements regarding an arrest, the following states the common law rule:

> An arrest by an officer is an official action, and a report of the fact of that arrest, or of the charge of crime made by the officer in making or returning the arrest, is therefore within the conditional privilege covered by this Section [Reports of Official Proceedings and Public Meetings]. On the other hand statements made *by the police,* or by the complainant or other witnesses, or by the prosecuting attorney *as to facts of the case* or the evidence expected to be given, are not yet part of the judicial proceeding, or of the arrest itself, and *are not privileged under this Section.* (Emphasis added).

Restatement (Second) of Torts, § 611, Comment h (Tent. Draft No. 20, 1974). Not being an arrest record nor a record required by statute or some other authority, but instead merely constituting a hearsay statement by police of facts of a case, the hot line will not qualify as an official record for purposes of this privilege. It should be noted that the Defendant's strongest case, *Piracci v. Hearst Corporation,* 263 F.Supp. 511 (D.Md.1966), *aff'd,* 371 F.2d 1016 (4th Cir. 1967), involves official arrest records. In that case, a newspaper's false report of a youth's arrest charge accurately based on information contained in the arrest docket and log book of the police was held privileged under the report of official records privilege. However, in our case, such a record would be the PD 251, considered as an arrest book record open to the public as required by statute, not the informal hot line which can inaccurately reflect (as it did in this case) the contents of such official records. Therefore, the common law privi-

lege of reporting official proceedings does not extend to the Star's false statements made in reliance on the hot line report.

This does not mean, of course, that the Star is foreclosed from showing that its reliance on the hot line report was reasonable and thus avoid liability. With the inapplicability of the official report privilege, the Star maintains the reasonableness defense to the applicable negligence standard and may well be able to prevail on its reasonable reliance on the hot line reports despite their non-official status.

## CONCLUSION

This case presents the clashing of two important interests in society, the constitutional freedoms of speech and press against the important reputational interests of private individuals long committed to the State bailiwicks for protection. In light of the constitutional limitations announced by the U.S. Supreme Court in *Gertz*, the common law policy of the District of Columbia to protect private reputational interests and the inapplicability under the facts of this case of any common law privilege, the media Defendant Star is potentially liable to the private citizen Plaintiff, Phillips, for actual damages caused by its defamatory publication under a negligence standard. Since there appears to be a genuine issue of fact as to whether it was reasonable for the Star to rely on the information in the "hot line" communication in view of its duty of care to the Plaintiff and his reputation, and there likewise being a genuine issue of fact of the actual damages suffered as a proximate result of the defamation, Defendant Star's Motion for Summary Judgment must be denied as to the actual damages alleged by the Plaintiff. However, because of the constitutionally mandated *Times* malice standard applicable to Plaintiff's claim for presumed or punitive damages, and the failure of Plaintiff to produce any evidence of

the Star's knowing or reckless false publication, Defendant's Motion for Summary Judgment as to the Plaintiff's claim for presumed and punitive damages must be granted.

Wherefore, in accordance with the above, it is this 30th day of June, 1977,

Ordered, that Defendant Star's Motion for Summary Judgment be, and is hereby partially granted as to punitive and presumed damages claimed by the Plaintiff John Phillips and;

Further Ordered, that Defendant Star's Motion for Summary Judgment be, and is hereby, partially denied as to the actual damages alleged and claimed by the Plaintiff John Phillips.

Each party to bear its own costs.

By the Court,

/s/ George H. Revercomb,
Judge

FERREN, Associate Judge, dissenting:

This appeal presents a substantial question about the libel law of the District of Columbia: what standard of liability—actual malice or negligence—should the courts apply when a "private figure" involved in a matter of "public or general concern" brings a damage action for defamation against a media defendant? Unlike my colleagues, I would adopt the actual malice standard set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). I would therefore hold that a private individual may recover damages for defamation by a publisher, editor, reporter, or broadcaster only if the plaintiff proves by clear and convincing evidence that the media defendant published the defamatory falsehood with knowledge that it was false or with reckless disregard as to whether or not it was false.[1]

1. *Accordingly, I would reverse the judgment* and award of nominal damages ($1.00) in favor of John Phillips; his evidence fails to meet the *New York Times* actual malice standard. I thus concur in the majority's affirmance of the trial court's order granting the Star's motion for summary judgment as to the claim for presumed (or punitive) damages. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974). I do not reach the narrower, common law privilege questions.

## I.

In *New York Times Co., supra,* the Supreme Court held that "a public official [may not recover] damages for a defamatory falsehood relating to his official conduct unless he proves [with 'convincing clarity'] that the statement was made with 'actual malice'—that is, with the knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* 376 U.S. at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion), extended *New York Times* to require all "private" defamation plaintiffs, not just "public" figures, to prove that a media defendant had proceeded with "actual malice" in publishing a matter of "public or general concern." *Id.* at 44, 91 S.Ct. at 1820. *Rosenbloom,* however, continued to permit a private plaintiff to hold the media strictly liable (as at common law) for defamatory publication of less newsworthy material. *See id.*

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court rejected this sharp distinction between publications that do, and do not, reach a level of "public or general concern." That line is typically too hard to draw, the Court said, stressing the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not ...." *Id.* at 346, 94 S.Ct. at 3010. In short, after *Gertz,* the degree of newsworthiness of a reported item was no longer to determine whether the media was substantially protected, or unprotected, against defamation suits by "private" individuals—a conclusion with which I wholeheartedly agree.

Perceiving the issue from a different angle, the Court in *Gertz* concluded that any difference in the degree of protection of the media should turn on another distinction highlighted by *New York Times* and *Rosenbloom*: whether plaintiffs are "public figures," who in fairness can be deemed to "have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them," *id.* at 345, 94 S.Ct. at 3009, or instead are "private individuals," who cannot be said to have assumed the risk of such exposure and thus deserve greater protection from the courts. *See id.* Accordingly, the Court in *Gertz,* while retaining the "actual malice" standard for "public figure" cases, *see id.* at 342–43, 94 S.Ct. at 3008, withdrew from the media the protection of that standard—so recently accorded in *Rosenbloom*—in cases brought by "private individuals." *See id.* at 347, 94 S.Ct. at 3010. The Court did so irrespective of how newsworthy a story might be—indeed, on the assumption that the story about the private individual is newsworthy by any test. *See id.* at 346, 94 S.Ct. at 3010. At the same time, the *Gertz* Court rejected "liability without fault" in any case against the media, *id.* at 347, 94 S.Ct. at 3010, thus attempting to remove altogether the questionable distinction in *Rosenbloom* between defamatory publication of matters that have "public interest" and those that do not. *See id.* at 346, 94 S.Ct. at 3010.

In receding from *Rosenbloom,* the Court in *Gertz* did not impose a standard. Instead, it invited the states, "so long as they do not impose liability without fault," to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010 (footnote omitted).[2] Most

**2.** Since the 1964 Supreme Court decision in *New York Times Co., supra,* it has been clear that *Chaloner v. Washington Post Co.,* 36 App. D.C. 231 (1911), no longer could reflect the law of the District of Columbia insofar as *Chaloner* imposed strict liability on the press for libel. *Compare id.* at 233 *with New York Times Co., supra* 376 U.S. at 279–80, 84 S.Ct. at 725–26. I do not share Judge Revercomb's conclusion

that, by virtue of *Chaloner,* the District retains a policy of "utmost protection" of defamed private-figure plaintiffs. *Ante* at 87. I believe that the *Gertz* invitation to the states (presumably including the District of Columbia), building upon substantial Supreme Court development of the law of defamation over the last decade and a half, has wiped our slate clean. It is interesting to note, therefore, that

commonly, this process has resulted in a choice between "actual malice" and "negligence." I turn to that inquiry.

## II.

As the *Gertz* majority recognized, newsworthiness—whether a matter is, or is not, of general or public concern—is not a proper criterion for judges to use in developing and applying a libel standard. *See Gertz, supra* 418 U.S. at 346, 94 S.Ct. at 3010. The press, not the judges, are the ones to decide what is newsworthy. This is what the First Amendment is all about.

Once a reported item is thus deemed newsworthy, I cannot accept the compromise, inherent in *Gertz*, that some reporting is to be more vulnerable to legal attack simply because private individuals, rather than public figures, are involved. For three reasons, I believe that, even in "private figure" cases, "the negligence standard gives insufficient breathing space to First Amendment values." *Rosenbloom, supra,* 403 U.S. at 52, 91 S.Ct. at 1824.

in adopting Judge Revercomb's opinion here, my colleagues in the majority basically endorse his reliance on *stare decisis*; they do not advance reasons why they prefer the negligence standard, as the Supreme Court in *Gertz* invited them to do. *Ante* at 80, 87.

I disagree, moreover, with my colleagues' assertion that the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit "at least implicitly—and arguably explicitly—endorse Judge Revercomb's opinion in this case," *ante* at 80, in *Wolston v. Reader's Digest Ass'n, Inc.,* 188 U.S.App. D.C. 185, 193 n.3, 578 F.2d 427, 435 n.3 (1978), *rev'd,* 443 U.S. 157, 160 n.2, 99 S.Ct. 2701, 2704 n.2, 61 L.Ed.2d 450 (1979). Those courts merely conclude that Judge Revercomb's opinion, given its thoroughness, was the most likely reflection of District of Columbia law (absent a definitive ruling at the time by this court). *See id.*

Finally, I do not understand my colleagues' puzzlement at my advancement of Justice Brennan's arguments from *Rosenbloom* in favor of an actual malice standard. *Ante* at 80. Their very quotation from *Gertz, ante* at 81, makes clear that the Supreme Court, in withdrawing the *Rosenbloom* mandate of an actual malice standard, has left it to each state (and presumably to this court) to adopt whatever standard it sees fit short of strict liability.

In the first place, the public-private figure distinction is as inherently difficult to manage as the *Gertz* Court found the *Rosenbloom* distinction between matters that are—and are not—of public or general concern.[3] As Justice Brennan has noted:

Voluntarily or not, we are all "public" men to some degree. Conversely, some aspects of the lives of even the most public men fall outside the area of matters of public or general concern. [Citations and footnote omitted.] Thus, the idea that certain "public" figures have voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction. In any event, such a distinction could easily produce the paradoxical result of dampening discussion of issues of public or general concern because they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of "public figures" that are not in the area of public or general concern. *Id.* at 48, 91 S.Ct. at 1824.[4]

**3.** *Waldbaum v. Fairchild Pubs., Inc.,* 201 U.S. App.D.C. 301, 627 F.2d 1287 (1980) demonstrates the complexity inherent in making this distinction. That case reveals that the *Gertz* majority, in overruling *Rosenbloom,* created two subclassifications of public figures: (1) the individual who is a public figure for all purposes and (2) the more common, limited-purpose public figure, *i.e.,* " 'an individual [who] voluntarily injects himself or is drawn into a particular public controversy and therefore [sic: thereby] becomes a public figure for a limited range of issues.' " 201 U.S.App.D.C. at 306, 627 F.2d at 1292 (quoting *Gertz, supra,* 418 U.S. at 351, 94 S.Ct. at 3012).

**4.** As indicated at the outset of Part II, I do not find "newsworthiness" to be a proper criterion for developing a libel standard applicable to the media. Thus, while I agree with Justice Brennan's criticism of the public-private figure distinction, I would not limit the actual malice standard to matters of "public or general concern." Because, however, the allegedly defamatory news item in this case undoubtedly concerned a matter of public interest, a decision here adopting the actual malice standard need not provide for its application beyond matters of "public or general concern," as in *Rosenbloom.*

*See* Anderson, *Libel and Press Self-Censorship* 53 Tex.L.Rev. 422, 480 (1975).

Second, I fear that even if the press can make the public-private figure distinction in most cases, our adoption of the negligence standard for the latter category of admittedly newsworthy news will force the media toward a degree of self-censorship that our society can ill afford. *See Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 99–100, 538 P.2d 450, 458 (en banc), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 683–685, 321 N.E.2d 580, 588–90 (1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); Anderson, *supra* at 425–52. The uncertainties inherent in a standard premised on "reasonable care" (in contrast with "reckless disregard") will "charge the press with 'the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait.'" *AAFCO, supra*, 162 Ind.App. at 683, 321 N.E.2d at 588

(quoting *Time, Inc. v. Hill*, 385 U.S. 374, 389, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967).[5] Such guessing will be complicated, moreover, because the negligence standard will likely carry with it a relatively light burden of proof, *i.e.*, a preponderance of the evidence, in contrast with the actual malice standard of clear and convincing evidence. *See Gertz, supra*, 418 U.S. at 366, 94 S.Ct. at 3020 (Brennan, J., dissenting); 3 Restatement (Second) of Torts § 580B, Comment j (1977). *But see* Anderson, *supra* at 458, 467. It is unlikely that the court itself will be able to afford much protection against erroneous, even vindictive verdicts; [6] the negligence standard, in this context, will deter the award of summary judgment. *See* Anderson, *supra* at 456–58, 469.[7] Accordingly, I am convinced that the negligence standard will disserve the public interest more, by fostering excessive self-censorship, than the actual malice standard would disserve it by creating a higher hurdle for defamed private individuals. *See Walker, supra* 188 Colo. at 99–100, 538 P.2d at 458.[8]

5. The *Gertz* limitation of a private individual's recovery to actual damages will do little to alleviate the uncertainties inherent in a negligence standard. "The *Gertz* Court's broad definition of 'actual' injury," including " 'impairment of reputation and standing in the community,' as well as 'personal humiliation, and mental anguish and suffering,' " will not "materially reduce the risk of capricious jury verdicts [ ] or ... deter a jury from punishing the publisher of unpopular ideas." *AAFCO, supra* at 684, 321 N.E.2d at 589 (quoting *Gertz, supra*, 418 U.S. at 350, 94 S.Ct. at 3012).

6. As the *Rosenbloom* plurality observed:
In the normal civil suit where this standard is employed, "we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor." *In re Winship*, 397 U.S. 358, 371 [90 S.Ct. 1068, 1076, 25 L.Ed.2d 368] (1970) (HARLAN, J., concurring). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement—the three-quarter-million-dollar jury verdict in this case could rest on such an error—but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First

Amendment cannot tolerate. [*Rosenbloom, supra*, 403 U.S. at 50, 91 S.Ct. at 1823.]

7. According to Professor Anderson:
Some courts will deny summary judgment on the ground that a negligence standard requires the kind of factual determination that has always been regarded as peculiarly within the competence of juries. But uncertainty concerning the definition of negligence represents the most important obstacle to summary procedure under *Gertz*. Whether it will be defined with the particularity that characterizes recklessness under *Times* remains to be seen, but unless the courts describe the negligence standard with some precision, the purposes of the *Gertz* privilege will be defeated just as surely as those of the *Times* privilege would have been if the Court had left the determination of reckless disregard to the unquestioned judgment of juries. [*Id.* at 457 (footnote omitted).]
*See also Nader v. de Toledano*, D.C.App., 408 A.2d 31, 41–44 (1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

8. Although the *New York Times* standard presents a substantial evidentiary hurdle for private plaintiffs in defamation suits, it can be met. *See, e.g., Walker, supra* 188 Colo. at 100–01, 538 P.2d at 458–59; Anderson, *supra* at 430, 435–38 (collecting cases). *See also Her-*

Finally, I am influenced by the unique position of this jurisdiction, our nation's capitol and a media center of the world.[9] These characteristics distinguish the District of Columbia from the states which, after *Gertz*, have adopted a negligence standard for the media in private-figure libel cases.[10]

It is true that Phillips is merely a local citizen, involved in an event of local interest reported by two large metropolitan newspapers. The standard we adopt today, however, will apply with equal force to private plaintiffs injected into national or world affairs. It will also apply to newspaper and broadcasting companies headquartered elsewhere in the country but with offices in the District of Columbia. I therefore worry that adoption of a negligence standard not only will deter complete reporting about matters of national and international importance generated in Washington, D.C., but also may force smaller or financially vulnerable companies to reconsider the advisability of maintaining offices here, given the costs of defending a libel suit.[11]

I respectfully dissent.

bert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

**9.** At least one commentator who favors the negligence standard in defamation suits involving private individuals concedes that "a different result may be mandated in some states by circumstances that attack special significance to either of the competing interests that are being balanced." 29 Vand.L.Rev. 1431, 1445 (1976).

**10.** *See Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (1977) (en banc); *Corbett v. Register Publishing Co.,* 33 Conn.Supp. 4, 12–13, 356 A.2d 472, 477 (Super.Ct.1975); *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 536, 543 P.2d 1356, 1366 (1975); *Troman v. Wood,* 62 Ill.2d 184, 198, 340 N.E.2d 292, 299 (1976); *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 232, 531 P.2d 76, 84 (1975); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 857–859, 330 N.E.2d 161, 168 (1975); *Thomas H. Maloney & Sons, Inc. v. E. W. Scripps Co.,* 43 Ohio App.2d 105, 109- 110, 334 N.E.2d 494, 498 (1974), *cert. denied,* 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Martin v. Griffin Television, Inc.,* 549 P.2d 85, 92 (Okla.1976); *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412, 417–18 (Tenn.1978); *Fos-*

ter v. Laredo Newspapers, Inc., 541 S.W.2d 809, 819 (Tex.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977); *Taskett v. KING Broadcasting Co.,* 86 Wash.2d 439, 447, 546 P.2d 81, 85 (1976) (en banc); Restatement, *supra* § 580B(c); *cf. Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975) (gross irresponsibility). *But see Walker, supra* 188 Colo. at 98–99, 538 P.2d at 547 (actual malice); *AAFCO, supra* at —, 321 N.E.2d at 586 (same). *See also Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978); *Jacron Sales Co. v. Sindrof,* 276 Md. 580, 350 A.2d 688 (1976).

**11.** *Cf. Rose v. Silver,* D.C.App., 394 A.2d 1368, 1373–74 (1978) (acknowledging First Amendment issue concerning reach of District of Columbia long-arm statute), *rehearing en banc denied,* 398 A.2d 787 (1979).