Robert C. WHITE, Plaintiff,

v.

FRATERNAL ORDER OF POLICE, Defendants.

Civ. A. No. 88–0679–OG.

United States District Court, District of Columbia.

Feb. 16, 1989.

---

582

Peter E. Derry, Pyne & Derry, Chevy Chase, Md., for plaintiff.

Dennis Davison, David & Hagner, Washington, D.C., for defendant FOP.

Kevin T. Baine, Williams & Connolly, Washington, D.C., for defendants Washington Post and NBC.

## MEMORANDUM

GASCH, District Judge.

### INTRODUCTION

This is a case brought by plaintiff Robert C. White ("White"), a Captain in the Washington Metropolitan Police Department ("MPD"), alleging invasion of privacy and defamation against the Fraternal Order of Police ("FOP"), the Washington Post Company ("the Post"), and the National Broadcasting Company, Inc. ("NBC").

### BACKGROUND FACTS

The parties have substantial disagreement about the relevance of certain facts to the issues in this case; nonetheless, the following facts are not in dispute.

In April 1985, White was nominated for promotion from the position of Lieutenant to Captain in the Washington Metropolitan Police Department. As a condition of promotion, plaintiff was required to undergo and pass a physical examination, including a urine test for drugs. On May 30, 1985, White submitted a urine sample for drug testing at the Police and Fire Department Clinic ("the Clinic"). Plaintiff's urine sample, identified only by a number, along with other samples, was tested at the Clinic using an Enzyme Multiple Immunoassay Test ("EMIT test"). The test performed on plaintiff's sample indicated a positive result for cannabis (marijuana).[1] White was notified of the positive result and he was instructed to return to the clinic to submit a second urine specimen. The standard operating procedure when an EMIT test result was positive was simply to forward the sample to the CompuChem, Inc. laboratory in North Carolina for confirmation of the EMIT test results. Plaintiff's submission of a second urine sample was not in accordance with the standard operating procedure at the Clinic.[2]

---

1. Plaintiff characterizes the results of the EMIT test as *"pending* positive."

2. White contends that the repeat test was not performed at his request. He further indicates that he was unaware, at the time he submitted the second sample, that receiving a second test was not standard operating procedure. *See* Plaintiff's Amended Response to Defendant Fraternal Order of Police's Statement of Material Facts [hereinafter Plaintiff's Response to FOP's Statement of Facts] at ¶ 4.

Plaintiff's urine samples were subsequently hand carried by a member of the MPD to the CompuChem laboratory in North Carolina. Hand delivery of urine samples to the CompuChem laboratory was also a departure from normal procedure. The laboratory determined both of plaintiff's urine samples to be free of drugs. White was then promoted to Captain, and later became head of the Police Department's narcotics squad.

Sometime in 1987, Mrs. Marguerite Anastasi and Officer Vernon Richardson, two employees of the Police and Fire Clinic who were involved with the MPD drug testing program, contacted defendant Fraternal Order of Police and informed the FOP of several irregularities they had observed in MPD drug testing procedures. Among other things, these employees related specific details about the circumstances surrounding the performance of plaintiff's drug tests and the handling of plaintiff's urine samples. Counsel for the FOP, Robert E. Deso, reported the employees' allegations to the United States Attorney for the District of Columbia, Joseph DiGenova, by letter dated July 15, 1987. Officer Gary W. Hankins, Chairman of the FOP, reported the allegations to Mayor Marion S. Barry, Jr., by letter dated July 28, 1987.[3] These letters form the basis of White's claims against the FOP.

After an introductory paragraph, both letters review the background of Mrs. Anastasi and Officer Richardson. Mrs. Anastasi, a civilian employee of the MPD for 24 years, was involved with drug testing procedures at the Clinic since the inception of the program in 1982. At the time of

plaintiff's test in 1985, she supervised the officers who conducted EMIT drug testing at the Clinic. Letters at ¶ 2. Officer Vernon Richardson, who was appointed to the MPD in 1973, conducted the great majority of the EMIT drug tests performed at the Clinic since 1984. Officer Richardson conducted the EMIT test that was performed on plaintiff's first urine sample on May 30, 1985. Letters at ¶ 3.

The letters go on to describe in great detail the events that transpired on May 30, 1985, the date on which plaintiff's urine test was performed, from the perspective of Officer Richardson. In addition to the irregularities discussed above, the letters also state several other important pieces of information regarding the handling of plaintiff's urine sample. The letters allege that Lieutenant Noyes, an officer superior to Officer Richardson, became very agitated upon discovering the identity of the individual who had provided the positive EMIT test.[4] After plaintiff was brought back to the Clinic and a second sample was collected, Lieutenant Noyes also allegedly stated to Officer Richardson, "I am giving you a direct order not to tell anyone about what went on." Letters at ¶ 7. The letters also allege that on the morning of May 31, 1985, before the samples were forwarded for confirmation, the officer who opened the drug lab discovered that the top lock on the laboratory door was unsecured. Letters at ¶ 9.

The letters further state that it was "highly unusual" that plaintiff's urine sample was not confirmed by the CompuChem lab because the EMIT test on plaintiff's

---

The submission of plaintiff's second urine sample departed from standard procedure in several respects. First, the fact that plaintiff was given the opportunity to submit a second sample in itself is a departure from normal procedure. Plaintiff was also permitted to witness the sealing of the bottle containing his second sample, which was not normal procedure. Also, plaintiff's second sample was not tested at the Clinic prior to being sent to the laboratory at North Carolina. This also represented a departure from standard operating procedure.

**3.** The two letters are almost identical. The language in the first and last paragraphs of the text

differs somewhat. Additionally, the July 28 letter includes a certification by Officer Richardson and Mrs. Anastasi that "[t]he information set forth above is true and accurate to the best of my information and belief." Hereinafter, the Court will use the term "the letters" to refer to the July 15 and the July 28 letters collectively.

**4.** Officer Richardson alleges that all urine samples on which he performed EMIT tests were submitted anonymously. Lt. Noyes was only able to identify the urine sample as belonging to plaintiff after Officer Richardson reported to him the number of the sample which had tested positive. Letters at ¶ 5.

first urine sample quantitatively indicated a high level of THC.[5] Mrs. Anastasi reported that she was advised about what transpired by Officer Hayes, who was also present at the Clinic on May 30, 1985. Mrs. Anastasi stated that she attempted to discuss the events of May 30 with the Administrative Director of the Clinic, but he refused to speak to her about the matter. Letters at ¶ 10. The letter also states that Officer Richardson, while testifying as a representative of the Clinic in an MPD adverse action hearing, "was shocked" to see the plaintiff sitting as a member of the Adverse Action Panel. Letters at ¶ 11.

The letters go on to make several allegations which bear no apparent relationship to the plaintiff. The letters allege that a Sergeant Kent Pulliam reportedly remarked that Lieutenant Noyes and a Sergeant John Harding "had on more than one occasion covered up for MPD officials who submitted urine samples for drug testing which resulted in pending positive tests." Letters at ¶ 11.

The letters also report that since February 1987, several administrative changes occurred at the Clinic, which in the opinions of Officer Richardson and Mrs. Anastasi, "severely compromised the integrity of the drug program." Letters at ¶ 12. The letters also indicate that Officer Richardson reported a number of problems to MPD officials including a deliberate falsification of a record. Letters at ¶ 12. The letters also allege that Officer Richardson has been ordered by Lieutenant Irish (who replaced Lieutenant Noyes) "not to discuss his complaints with anyone." Letters at ¶ 12.

Additionally, the letters state that in June 1987, "Officer Richardson discovered that seven consecutive dates of drug screening records were missing from the files." Letters at ¶ 13. The letters indicate that Officer Richardson and Mrs. Anastasi believe that the records were removed for an improper purpose. *Id.*

The letters also state that "Officer Richardson and Mrs. Anastasi are convinced that there is a systematic effort to subvert the integrity of the drug testing procedures at the Police and Fire Clinic and to manipulate the procedures so that desired results can be obtained." Letters at ¶ 14. The letters further state:

While it appears that drug testing procedures have been subverted to protect one and possibly more MPD officials from the results of positive urinalysis tests, it is also quite possible that procedures have been subverted to report positive results on certain individuals whose tests may not have been positive, thus causing them to lose their employment. If the system has been corrupted, the ramifications are wide-spread. If records have been falsified, false statements made, or testing procedures subverted for gain (such as promotion), it is likely that criminal as well as ethical violations have been committed.

Letters at ¶ 14. The above paragraph concludes with a footnote that states that possible statutory violations include bribery, tampering with physical evidence, and breach of standards of conduct. The letters conclude with a promise of cooperation on behalf of Mrs. Anastasi and Officer Richardson. Letters at ¶ 15.

Upon receipt of the letter of July 28, 1987, Mayor Barry referred the matter to the Chief of Police, who created a special investigative committee ("the Cox Committee") to examine the allegations contained in Officer Hankins' letter to the Mayor.[6] The Committee consisted of Assistant Police Chief Ronal D. Cox, Assistant Police Chief Melvin C. High, and Assistant General Counsel Terrence D. Ryan. The Com-

---

5. THC refers to delta-9-tetrahydrocannabinol, the principal psychoactive ingredient of marijuana and hashish. The letter alleges that plaintiff's urine sample tested 12 and 10 points above the low cut-off point of 20 nanograms of THC (or 44 and 42 points above negative). Letters at ¶ 9.

6. The Court is unaware of any action taken by the United States Attorney in this matter upon receipt of the July 15 letter, although plaintiff gives some indication that the U.S. Attorney contacted the Mayor's office about the matter. Memorandum in Opposition to Defendant FOP's Motion to Dismiss at 28–29.

mittee conducted an extensive investigation and issued a report to the Chief of Police in December 1987. The Committee found that police officials had deviated from standard operating procedures in securing a second urine sample from White after the initial screening test was positive, in failing to conduct an initial screening test on White's second specimen before sending it to the laboratory in North Carolina for testing, and in having police officers carry the samples to North Carolina. As a result of the Cox Committee's findings and recommendations, Police Chief Turner reprimanded his Assistant Chief, the Director of the Department's Internal Affairs Division, and an official of the Police Clinic.

The defendant the Washington Post published articles on August 25, September 19, 22, and 24, November 20, 1987, and January 16, 17, 22, and 25, 1988 concerning the FOP's allegations and the Cox Committee's investigation of those allegations. These articles form the basis of White's claims against the Post. Three of the articles that discussed the specific circumstances surrounding plaintiff's urine testing indicated that a second sample was obtained from plaintiff on the same day as the first sample and that the second sample was reported to be free of drugs.[7] These articles did not indicate, however, that plaintiff's first urine test was not confirmed. The article published on January 17, 1988 stated that both the first and the second samples were free of drugs. None of the Post articles mentioned the plaintiff by name, nor was plaintiff's picture included with any of the articles.

On September 28, 1987, National Broadcasting Company, Inc.'s Channel 4 broadcast a report that forms the basis of White's claim against NBC. NBC asserts that the broadcast was a report on the FOP allegations and the investigation of the Cox Committee. White argues that the broadcast was about him and not about the Cox Committee. The NBC report indicated plaintiff's name and displayed his photograph. That broadcast did not indicate that plaintiff's initial positive screening urine test was determined subsequently to be free of drugs.

Plaintiff's complaint alleges counts of invasion of privacy and defamation against each defendant. Each of the defendants previously moved to dismiss the case for failure to state a claim. Extraneous materials (affidavits) were submitted by FOP as enclosures to their memorandum of points and authorities in support of their motion to dismiss. Plaintiff, in response, submitted extraneous materials as part of his memorandum in opposition to FOP's motion. With respect to FOP, therefore, the motion to dismiss was to be treated as a motion for summary judgment. The Court heard argument on September 13, 1988 and decided that these matters should be considered as motions for summary judgment with respect to all parties. Presently, all three defendants have agreed to have their motions treated as motions for summary judgment.

## DISCUSSION

In Part I of the discussion, the Court reviews the appropriate standard for granting summary judgment. In Part II, the Court reviews the plaintiff's claims for invasion of privacy. In Part III, the Court considers the plaintiff's defamation claims. In Part IV, the Court considers whether, as an alternative holding, defendants are entitled to summary judgment on the basis of privileges they assert. The privilege theories are considered separately because of their potential applicability to the invasion of privacy claims as well as plaintiff's defamation claims.

## I. STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment is properly granted when "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). All undisputed facts and "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold,*

---

**7.** These articles were published on August 25, September 19, and November 20, 1987.

*Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court stated:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.... [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted.

477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

In *Washington Post Co. v. Keogh,* 365 F.2d 965 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), the Court stated:

> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the [*New York*] *Times* [*Co. v. Sullivan,* 376 U.S. 254, 85 S.Ct. 710, 11 L.Ed.2d 686 (1964)] principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government.

365 F.2d at 968. *See McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 717 F.2d 1460, 1467 (D.C.Cir.1983) (reiterating same).

## II. INVASION OF PRIVACY

Plaintiff includes a count for invasion of privacy against each defendant. Because plaintiff does not specify his theory of recovery, for purposes of this motion, the Court must consider all possible theories upon which plaintiff could recover. In *Dresbach v. Doubleday & Co., Inc.,* 518 F.Supp. 1285 (D.D.C.1981), the Court briefly reviewed the background of this tort.

> Invasion of privacy was not an early common law action, but was adopted in various forms by courts and legislatures beginning in the early twentieth century on the inspiration of a law review article by Samuel D. Warren and (later to be Justice) Louis D. Brandeis, *The Right to Privacy,* 4 Harvard L.Rev. 193 (1890). The cause of action described in the article was based on the right "to be let alone", free from the unauthorized publication of matters concerning one's private life, habits, acts, and relations. The injury to be redressed was to the feelings and sensibilities of the person, (rather than to his reputation in the community as in a defamation action), and the truth or falsehood of the publication was irrelevant, as was the ill will or culpability of the author. However, the right of privacy described in the article did not prohibit publication of matter of public of general interest.

*Id.* at 1287.

Prosser stated that "the law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff 'to be let alone.'" W. Prosser, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Torts* § 117, at 851 (5th ed. 1984) [hereinafter *"Prosser on Torts"*]. These torts include appropriation, intrusion, publication of private facts, and placing the plaintiff in a "false light in the public eye." *See id.* § 117; *see also* R. Smolla, *Law of Defamation* § 10.01 (1986).

▇ The only tort theory propounded by the facts set forth in plaintiff's complaint is that of publication of private facts.[8] To recover under this theory, a

---

**8.** The torts of intrusion and appropriation are not even remotely applicable under the facts presented.

The Court has also considered whether a "false light" claim is supported by the facts set forth in the complaint. A statement need not be defamatory to be actionable under this tort the-

plaintiff must show (1) the publication of private facts (2) in which the public has no legitimate concern (3) whose publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities. *Dresbach v. Doubleday & Co., Inc.,* 518 F.Supp. 1285, 1287 (D.D.C.1981).

■ The plaintiff concedes that irregularity in the Police Department's Drug Testing Program is a matter of public concern. *See* Defendant FOP's Statement of Material Facts As To Which There Is No Genuine Issue at ¶ 10; Plaintiff's response to FOP's Statement of Facts at ¶ 10. Plaintiff argues, however, that the letters, articles, and broadcast are actionable because their main focus is about plaintiff—not about irregularities in the Police Department's Drug Testing Program. Plaintiff's Response to FOP's Statement of Facts at ¶ 10. The Court finds plaintiff's argument to be untenable.

The public clearly has a legitimate concern in knowing about possible corruption within the Police Department. In particular, a strong public interest exists in knowing whether normal drug testing procedures were subverted to protect a high-ranking police official who was subsequently assigned to be the head of the Police Department's narcotics squad. Additionally, a strong public interest exists in knowing whether police officers are receiving disparate treatment within the MPD drug testing program. Because an essential element of plaintiff's cause of action is lacking, defendants are entitled to summary judgment with respect to the invasion of privacy counts.

## III. DEFAMATION

### A. *Review of the Relevant Law*

#### 1. *Defamation—The Cause of Action*

■ To create liability for defamation about a matter of public concern, a plaintiff who is a public official[9] or a public figure must prove the following elements: (1) that the allegedly defamatory statement was published by the defendant to a third party; (2) that the statement has a defamatory meaning which was attributed to it by the recipient; (3) that the statement is false; and (4) that the statement was made with actual malice, *i.e.,* "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). *See also Restatement (Second) of Torts* § 558 (1977) [hereinafter *"Restatement of Torts"*]. Even if the plaintiff succeeds in proving each of these elements, the plaintiff's claim may be defeated if the defendant succeeds in proving that the statement constitutes an expression of opinion or that the statement is privileged. Therefore, if a court finds that plaintiff is unable, as a matter of law, to establish any one of these elements, or, alternatively, if a court finds that a defendant's statement is protected as opinion or was privileged as a matter of law, summary judgment must be entered in defendant's favor.

In this case, it is undisputed that the allegedly defamatory. statements were published by the defendants. The second, third, and fourth elements above, as well as the questions of privilege and opinion, however, require somewhat deeper analysis.[10]

#### 2. *Determining Defamatory Meaning*

■ "The question of whether or not the meaning of a particular communication is defamatory is one for the court...." *Prosser on Torts* § 111, at 774. The relative responsibilities of the judge and the jury in a defamation action were set forth by the United States Supreme Court in *Washington Post v. Chaloner,* 250 U.S. 290, 39 S.Ct. 448, 63 L.Ed. 987 (1919).

---

ory. R. Smolla, *supra,* at § 10.02[2][b]. The Court finds, however, that no basis exists for asserting such a claim because the plaintiff has not been placed in any "false light." *See* Discussion, Part III B., *infra* (discussion of falsity).

**9.** Plaintiff concedes that he is a public official. *See* Defendant's [FOP's] Statement of Material

Facts As To Which There Is No Genuine Issue at ¶ 9 and Plaintiff's Amended Response To Defendant Fraternal Order of Police's Statement of Material Facts at ¶ 9.

**10.** The privilege issues are discussed separately in Part IV, *infra.*

A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.... When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.

*Id.* at 293, 39 S.Ct. at 448 (quoting *Commercial Publishing Co. v. Smith,* 149 F. 704, 706–07 (6th Cir.1907)). As a threshold matter, therefore, the Court must find that an allegedly defamatory statement is capable of bearing at least one defamatory meaning before submitting to the jury the question of whether the statement was understood to have the defamatory meaning.

The Court finds that under the prevailing law, to determine whether a particular communication is capable of bearing a defamatory meaning, the Court must consider three questions. First, the Court must consider whether the allegedly defamatory communication is capable of being understood as referring to the plaintiff. This is generally referred to as the "of and concerning" requirement. *See* R. Smolla, *supra,* at § 4.09 (1986).

Second, the Court must consider whether the allegedly defamatory meaning proffered by the plaintiff is, in fact, defamatory, *i.e.,* whether "it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Afro–American Publishing Co. v. Jaffe,* 366 F.2d 649, 654 (D.C.Cir.1966) (en banc). *See Restatement of Torts* § 614(1)(b). "[A]n unprivileged falsehood need not entail universal hatred to constitute a cause of action.... That it will be known by a large number, and will lead an appreciable fraction of that number to regard the plaintiff with contempt, is enough to do [him] practical harm." *Sullivan v. Meyer,* 91 F.2d 301, 302 (D.C.Cir. 1937) (quoting *Peck v. Tribune Co.,* 214 U.S. 185, 190, 29 S.Ct. 554, 556, 53 L.Ed. 960 (1909)).

Third, if the Court finds that the meaning of the communication proffered by plaintiff is defamatory, the Court must also determine whether the recipient of the communication reasonably could have understood the communication to have had the defamatory meaning. *See Greenbelt Cooperative Publishing Assn., Inc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970);[11] *Restatement of Torts* § 614(1)(a). *See also Harrison v. Washington Post Co.,* 391 A.2d 781, 783 (App.D. C.1978) (trial court must decide if the words "are reasonably susceptible of or reasonably could be understood to have the meaning suggested by the innuendo"); *Levy v. American Mutual Liability Ins.*

**11.** *Bresler* involved a review by the Supreme Court of a decision by the Maryland Court of Appeals affirming a judgment in the trial court which awarded the plaintiff in a libel action $5,000 in compensatory damages and $12,500 in punitive damages. *Id.* 398 U.S. at 8, 90 S.Ct. at 1538. The plaintiff in that action was conceded to be a public figure. The speech that formed the basis of the libel action comprised two news articles in the "Greenbelt News Review" that reported on city council meetings on an issue of public controversy. Some people had characterized plaintiff's negotiating position in the controversy as "blackmail." The word "blackmail" subsequently "appeared several times, both with and without quotation marks, and was used once as a subheading within a news story." *Id.* at 7–8, 90 S.Ct. at 1538–39.

The Supreme Court reversed because the jury instruction regarding "malice" was not in accord with *New York Times. Id.* at 10, 90 S.Ct. at 1539. The Court, however, proceeded to consider whether the articles were capable of a defamatory meaning. After noting that the articles truthfully and accurately reported what had been said at the public meetings, *id.* at 12, 90 S.Ct. at 1540, the Court stated that "[i]t is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant.... No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense." *Id.* at 14, 90 S.Ct. at 1541.

*Co.*, 196 A.2d 475, 476 (App.D.C.1964); *Restatement of Torts* § 563.

█ A communication may be defamatory either because of what is expressly stated or on account of an implied meaning. *See generally* R. Smolla, *supra*, at § 4.05 (defamation through implication). Whether a communication is capable of a defamatory meaning must be determined by considering the allegedly defamatory words in light of their context.

> Because of the subtleties in any language the task of construing words in context is often complex. Words that appear at first blush to convey a defamatory meaning may be explained away as innocuous when their context is made clear. Conversely, words innocent on their face may, when explained in context, convey a defamatory meaning.

*Id.* § 4.05, at 4–14 (footnote omitted). In addition to considering the allegedly defamatory words in the context of the overall communication, the Court must also consider whether the existence of extrinsic facts render the communication defamatory, by creating what, under common law pleading, was called an "innuendo."

The law in this jurisdiction permits a plaintiff to recover under a theory of defamation by implication. For example, in *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir. 1987) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), the Court stated:

> The statement that "a father set up his son in business" would ordinarily mean to a reasonable reader that the father provided the son with the means or opportunity by which the latter could assume a position of responsibility in a business venture or commercial firm.... In our view, when the term "set up" is employed in a familial context, it implies that one family member provided an opportunity to another family member on the basis of kinship, not merit. Accordingly, we hold that the article, as a matter of law, can reasonably be interpreted as capable of bearing a defamatory meaning, namely that Tavoulareas, as president of Mobil, made it possible for Peter to become a partner in Atlas and then helped to ensure that the business would prosper because Peter was his son.

*Id.* at 780 (citation omitted).

█ The law regarding defamation by implication is laced with subtleties and riddled with fine distinctions. The Court finds, however, that making sense of this imbroglio is essential to the principled resolution of the issues before this Court. Accordingly, one important, but subtle, point requires clarification. A communication is not rendered defamatory simply because a recipient may draw a defamatory inference from it. Rather, the communication itself must be capable of bearing a defamatory meaning—the recipient must be able to reasonably understand the statement to convey the defamatory meaning. If the communication is not capable of bearing a defamatory meaning, it is irrelevant what inferences can reasonably be drawn by a recipient.[12]

12. A great deal of confusion in the law of defamation stems from the frequent appearance of the words "infer" and "inference." Webster's Third New International Dictionary (unabridged ed. 1981) defines "infer" as "to derive by reasoning or implication; conclude from facts or premises; accept or derive as a consequence, conclusion, or probability." *Id.* at 1158. "Infer" can also mean "guess" or "surmise." *Id.*

A reasonable inference from a given communication, therefore, permits a substantial amount of speculation on the part of the recipient. It may be reasonable for a recipient to guess or surmise about certain conclusions, even though the communication itself could not be reasonably understood to convey those conclusions. A brief example illustrates this point.

If a newspaper accurately reported that an individual was arrested and charged with a crime, a reader could reasonably infer, *i.e.,* guess, surmise, or derive as a probability, that the individual actually committed the crime. However, unless the newspaper article, considered as a whole, in context, could be reasonably understood to express that the individual in fact committed the crime, the newspaper report would not be actionable, questions of privilege aside.

As a practical matter, a very substantial overlap exists between what meaning a communication is capable of bearing and the inferences that can reasonably be drawn from it. However, the former is the essential inquiry, under existing law, for determining whether a given communication is actionable.

This principle is clearly set forth in the Second Restatement of Torts: "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, *understands that it was intended to express.*" *Restatement of Torts* § 563 (emphasis provided).[13] One comment to the *Restatement* further clarifies this matter.

> It is not enough that the language used is reasonably capable of a defamatory interpretation if the recipient did not in fact so understand it. On the other hand, it is not enough that the particular recipient of the communication actually attaches a defamatory meaning to it. If the defamatory meaning is not intended, it must be a reasonable construction of the language.

*Id.* comment c. The issue, therefore, is not whether it is reasonable for the recipient to draw a defamatory inference from a particular statement; the issue is whether it is reasonable for the recipient to understand the statement to bear the alleged defamatory meaning.[14]

### 3. *Falsity*

The well-established common law rule prior to the constitutionalization of many aspects of defamation law was that "truth is an affirmative defense which the defendant must plead and prove." *Prosser on Torts* § 116. "Once the plaintiff at common law established that the communication was defamatory, it was presumed false, and it was up to the defendant to rebut the presumption." Smolla, *supra,* at § 5.05 at 5–7.

The Supreme Court's decision in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), clearly altered that common law rule. In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Court interpreted the *New York Times* decision as holding that "a public official might be allowed the civil remedy [for defamation] only if he establishes that the utterance was false...." *Id.* at 74, 85 S.Ct. at 215. These First Amendment decisions, therefore, modified the common law rule in cases involving public officials where the speech involves a matter of public concern in two ways: first, the issue of truth or falsity was changed from an affirmative defense to an element of the tort of defamation; second, the burden of proof shifted to the plaintiff to establish falsity, *i.e.,* the common law presumption of falsity was abolished.

■ Although the *Garrison* court's interpretation of *New York Times* was undoubtedly broad, and although commentators were not in uniform agreement about the effects of these decisions, *see Prosser on Torts* § 116 at 839 (disagreeing in part with this interpretation), the Supreme Court's recent decision in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), leaves no doubt that this statement of the law is correct. In *Hepps,* the Court held that the Constitution requires the burden of proof on the issue of truth or falsity to be placed on a private figure plaintiff in a

---

**13.** Plaintiff cites this section of the Restatement in support of his argument. *See* Plaintiff's Response to Supplemental Memorandum of the Post and NBC ["Plaintiff's Response to Supplemental Memorandum"] at 3.

**14.** Defendants direct the Court's attention to a recent case in another jurisdiction which held that "there can be no libel by innuendo of a public figure." *Pietrafeso v. D.P.I., Inc.,* 15 Med. L.Rptr. 1736, 1738 (Colo.Ct.App.1988); *see* Supplemental Memorandum in Support of the Motion of Defendants the Post and NBC to Dismiss at 1–2. Other courts have reached similar conclusions. *See Strada v. Connecticut Newspapers, Inc.,* 193 Conn. 313, 477 A.2d 1005, 1010 (1984) ("In the absence of ... undisclosed [material] facts, first amendment considerations dictate

that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident."); *Schaefer v. Lynch,* 406 So.2d 185, 188 (La.1981) ("[T]ruthful statements which carry a defamatory implication can be actionable. However, that is only true in the case of private citizens and private affairs.").

Plaintiff argues that *Pietrafeso* has not been accepted as the law in the District of Columbia. The District of Columbia has neither adopted nor rejected these principles. The Court notes that the adoption of such a rule, however, would not necessarily be irreconcilable with the law in this jurisdiction. Neither *Tavoulareas* nor *McBride* specifically addressed the issue of defamation by innuendo.

defamation action where the speech involves an issue of public concern.[15] *Id.* at 776–77, 106 S.Ct. at 1563–64. Unquestionably, the Constitution requires no less of a plaintiff who is a public official where the speech involves an issue of public concern. *See id.* at 775, 106 S.Ct. at 1563.

### 4. *Malice*

The United States Supreme Court also held in *New York Times* that, in a libel suit brought by a public official, the First Amendment requires the plaintiff to prove that the defendant acted with "actual malice" in publishing the defamatory statement. The Court defined "actual malice" as "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." 376 U.S. at 280, 84 S.Ct. at 726. The Court further held that the Constitution required the plaintiff to prove actual malice with "convincing clarity." *Id.* at 285–86, 84 S.Ct. at 728–29.

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court considered "whether the clear-and-convincing evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in a case to which *New York Times* applies." *Id.* 477 U.S. at 244, 106 S.Ct. at 2508. The Court held that "[w]hen determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.*" *Id.* at 254, 84 S.Ct. at 713. "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.*

### 5. *Opinion*

■ It is well-established that expressions of opinion, as opposed to statements of fact, are not actionable. In *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), the United States Court of Appeals for the District of Columbia Circuit stated that the implicit command of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) "imposes upon both state and federal courts the duty as a matter of constitutional adjudication to distinguish facts from opinions in order to provide opinions with the requisite, *absolute First Amendment protection.*" 750 F.2d at 975 (emphasis provided).[16] The distinction between fact and opinion is a question of law to be decided by the court. *Id.* at 978.

The *Ollman* court acknowledged that making a reasoned distinction between fact and law is frequently difficult. The court indicated that the proper approach was to evaluate the "totality of the circumstances" in which the allegedly defamatory statement was made to determine whether the statement merits absolute First Amendment protection. *Id.* at 979. The court set forth a four-step analysis to aid courts in distinguishing systematically assertions of fact from expression of opinion. *Id.*

First, courts should "analyze the common usage or meaning of the specific language of the challenged statement itself." *Id.* Second, courts should "consider the statements verifiability—is the statement capable of being objectively characterized as true or false?" *Id.* Third, courts should "consider the full context of the statement … inasmuch as other, unchallenged language surrounding the allegedly

---

**15.** The Court in *Hepps* noted that it had not considered whether the same standard would apply if the case involved a nonmedia defendant. *Id.* 475 U.S. at 779 n. 4, 106 S.Ct. at 1565 n. 4. To the extent that the decision in *Hepps* was premised on *New York Times,* however, this qualification has no bearing on the law applicable to the present case. *New York Times,* like the present case, involved both media and nonmedia defendants. 376 U.S. at 256, 84 S.Ct. at 713. (*Abernathy et al. v. Sullivan* was decided together with *New York Times Co. v. Sullivan. Id.* at 254, 84 S.Ct. at 713).

**16.** The court noted that although the statement in *Gertz* about opinion being entitled to absolute First Amendment protection was *dicta,* it has been accepted as controlling law by a majority of federal circuit courts including the District of Columbia Circuit. 750 F.2d at 974 n. 6.

defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content." *Id.* Fourth, courts should "consider the broader context or setting in which the statement appears." *Id.*

### B. *Application of the Law to this Case*

Having reviewed the relevant law, the Court now considers whether the allegedly defamatory statements in the present case are actionable. All defendants argue that they are entitled to summary judgment because the allegedly defamatory statements are not capable of a defamatory meaning; because the statements are true; and because the statements are privileged.[17]

FOP additionally argues that the statements are not actionable because they consist of constitutionally protected opinion. Defendant FOP also argues that because the facts in the letters sent by FOP are *true,* that plaintiff is unable, as a matter of law, to prove actual malice under *New York Times.* The issue of actual malice is not before the Court with respect to the Post and NBC for purposes of this motion for summary judgment. These defendants' position is that they are entitled to judgment as a matter of law without ever reaching the question of malice.

Plaintiff's theory about how the communications at issue create a defamatory meaning differ slightly between the letters in the case of FOP and the articles and broadcast in the case of the Post and NBC, respectively. Accordingly, the Court considers separately the claims against FOP and those against the media defendants.

### 1. *Fraternal Order of Police Letters*

Plaintiff's claim of defamation against FOP is premised entirely on a theory of defamation by implication. Plaintiff does not dispute the factual accuracy of the letters. Rather, he claims that the letters create two defamatory implications. First, he claims that the letters imply that he is, or was, a drug user. Second, he claims that the letters imply that he committed criminal activity, specifically that he committed bribery to secure promotion to the rank of captain.

■■■ The Court notes at the outset that neither of the letters expressly states that plaintiff was a drug user nor do the letters accuse plaintiff of having committed bribery. The letters do indicate the true facts that plaintiff had a positive EMIT test on May 30, 1985, that several irregularities surrounded the handling of his urine samples, and that his urine samples, which were transported to the CompuChem lab, did not indicate the presence of drugs. The Court acknowledges that a reader could infer (*i.e.,* guess or surmise) from this information, that plaintiff was in fact a drug user. As discussed above, however, this does not render the letters actionable unless the letters could reasonably be understood to assert that plaintiff was a drug user. The Court finds that, aside from the true facts, the letters make no other references to plaintiff that would support the conclusion that he was a drug user.[18] Accordingly, the Court finds that the letters, considered as a whole, cannot reasonably be understood to mean that plaintiff is a drug user.[19]

---

**17.** The defendants FOP and the Post/NBC have different theories as to why their statements are privileged. FOP asserts privileges based upon (1) the absolute privilege associated with a complaint that initiates a judicial or quasi-judicial proceeding and (2) the conditional privilege to represent the interests of its membership by advising the responsible authorities of serious charges of misconduct brought to it by one of its members, as well as other conditional common law privileges. The Post and NBC assert privileges based upon (1) the privilege to fairly and accurately report accounts of governmental proceedings and (2) the privilege of neutral reportage.

**18.** The letters do not include any personal reports of individuals accusing plaintiff of drug use, nor do the letters allege that plaintiff has any associational ties to drug users or drug distributors. The letters do not allege that plaintiff has engaged in any behavior consistent with drug abuse. In fact, the letters do not even suggest that the plaintiff's EMIT test was positive as the result of deliberate ingestion of a drug.

**19.** The Court acknowledges that plaintiff could prove that the sections of the letter which are at issue are "of and concerning" him. The Court also acknowledges that if the letters were *capa-*

■ The Court also finds that the letters cannot be understood to accuse the plaintiff of bribery. Viewing the facts in the light most favorable to plaintiff, the Court finds that the letters may be interpreted to suggest that procedures were subverted to protect plaintiff in this case. The Court finds, however, that the letters are not actionable in this regard for three reasons. First, the possibility that procedures were subverted to protect plaintiff is suggested by an accurate presentation of the concededly true facts. This is not a case where the selective presentation of relevant information or the clever juxtaposition of facts leads a reader to a defamatory conclusion. The defamatory inference, if any, arises from the true facts themselves. Second, even if the letters can be interpreted to convey that standard procedures were subverted to protect plaintiff, at worst, the letters can be understood to characterize the plaintiff as the unwitting beneficiary of others' wrongdoing. Nothing in the letters expressly or impliedly indicates that plaintiff requested, caused, or participated in any wrongdoing; in fact, the letters cannot even be reasonably understood to express that he was *aware* of any wrongdoing.

Finally, considering the factors set forth in *Ollman*,[20] the Court finds that, even if *arguendo* the letters could be construed to have the meaning alleged, the letters would be entitled to protection as expressions of opinion.

■ Having considered whether the letters convey the general meanings alleged by plaintiff, the Court also considers briefly the specific statements to which plaintiff's counsel drew the Court's attention at oral argument. Plaintiff alleges that a defamatory meaning arises from the statement that it was "highly unusual" for a sample that was well above the low cut-off point on the EMIT test to come back unconfirmed and from Officer Richardson's statement that he was "shocked" to see plaintiff sitting as a member of an Adverse Action panel. The Court finds that both of these statements clearly are expressions of opinion as to the reliability of the EMIT test; accordingly, these statements are not actionable.[21]

■ The Court also finds the letters are not actionable because plaintiff, as a matter of law, cannot meet the burden of establishing actual malice by clear and convincing evidence in this case. Where, as here, all the facts in the letters are concededly true, it is a legal impossibility for plaintiff to prove that the statements were published with knowledge that they were false or with reckless disregard of whether they were false or not.[22]

## THE POST/NBC

The plaintiff's claims against the media defendants are somewhat simpler to analyze. To the extent that the Post articles and the NBC broadcast republish the allegations in the FOP's letters, the same analysis set forth above applies for purposes of determining whether the Post arti-

---

*ble* of being understood to assert that plaintiff was a drug user or that plaintiff committed bribery, under *Jaffe*, they would be defamatory.

**20.** *See supra* Part III A.5.

**21.** Plaintiff contends that the EMIT test is known to be extremely unreliable. Specifically, plaintiff contends that during one period at the Police and Fire Clinic, seventeen of eighteen positive EMIT tests were subsequently unconfirmed. The Court finds that even viewed in the light most favorable to plaintiff, this fact is entitled to limited significance for purposes of the action. First, the argument takes no account of the fact that plaintiff's urine sample indicated a level that was well above the low cut-off point. Second, this retrospective "in-

house" study is equally consistent with the conclusion that tampering with urine tests for the protection of individuals who tested positive was, in fact, widespread during this period.

**22.** Plaintiff contends that he "has not been afforded the right to discovery that is appropriate to the summary judgment stage...." Memorandum In Opposition to Defendant FOP's Motion to Dismiss at 11. The Court finds, however, that plaintiff's contention that further discovery may produce evidence of actual malice must be rejected in view of the plaintiff's concession that the facts alleged in the letters are true. Bearing in mind the actual quantum and quality of proof necessary to support liability under *New York Times*, the Court finds summary judgment is proper at this stage.

cles and the NBC broadcast are capable of a defamatory meaning.[23]

With respect to the media defendants, however, plaintiff raises two additional arguments. First, plaintiff contends that the failure of both the Post and NBC to present information on the alleged unreliability of the EMIT tests renders the articles and the broadcast actionable. Second, the plaintiff argues that several of the Post articles are inaccurate and untrue because plaintiff's first urine sample, which tested positive on the EMIT test performed at the Police and Fire Clinic, was not subsequently confirmed by the CompuChem laboratory.

■■■ The Court finds neither argument persuasive. Plaintiff's contention that a press report about the results of a laboratory test must be accompanied by reliability data on the testing procedure is unprecedented. The Court is unaware of any authority which would support such a claim.

■■■ Plaintiff also contends that several of the Post articles are defamatory because they indicate that the second urine test was negative, but give no indication that the first test was later unconfirmed. Considering the articles in context, the Court cannot agree that this creates a defamatory meaning. Although the articles in question do not indicate that the confirmatory test on plaintiff's first urine sample was negative, the articles also do not state that the first test was confirmed. Rather, the articles make no mention of the first test even being sent for confirmation.

The Court also finds that, considered in light of plaintiff's theory, the Post's failure to mention the results of the confirmatory test on plaintiff's first urine sample could not logically constitute a significant omission. To the extent a reader would believe the results of any testing performed by the CompuChem lab to discount the meaning of a positive EMIT test, the reader, presented

with the facts set forth in the Post, would have concluded that the EMIT test performed on plaintiff's first urine sample was unreliable.[24] On the other hand, if a reader were to conclude that the second sample was negative because it had been tampered with, surely a reader would have reached the same conclusion regarding the first sample, had the fact been reported.

The Court finds, as a matter of law, that the statements that form the basis of plaintiff's claims of defamation against the Post and NBC, viewed in the light most favorable to plaintiff and considered in the context of the undisputed facts, are not capable of being proven to be false and are not capable of a defamatory meaning.

## IV. PRIVILEGE THEORIES

All of the defendants also assert defenses of privilege. The Court considers whether defendants, in the alternative, are entitled to summary judgment on the basis of any privilege asserted. Because the privilege theories differ between the FOP and the media defendants, the Court considers the privilege theories asserted by each separately.

### A. *FOP*

The FOP argues that its letters are entitled to an absolute privilege because the letters were the first step in a quasi-judicial or administrative proceeding. Alternatively, FOP argues that it is entitled to "[n]umerous well-established conditional privileges." Memorandum of Points and Authorities in Support of Defendant Fraternal Order of Police's Motion to Dismiss at 24.

■■■ "It is well-settled that defamatory statements published incidental to judicial proceedings are absolutely privileged, providing the statements are relevant to the proceeding." *Mazanderan v. McGranery,* 490 A.2d 180, 181 (App.D.C.1984). "The application of absolute privilege has been extended to encompass quasi-judicial pro-

---

**23.** Although the Post articles never mentioned the plaintiff by name, it is well established that a plaintiff need not be expressly named for a communication to be "of and concerning" him. *See* R. Smolla, *supra,* at § 4.09[2].

**24.** The Post articles in question all indicated that the second test was performed on the same day as the first test.

ceedings conducted by administrative bodies." *Id.* The scope of this absolute privilege has been expanded even further to cover statements made pursuant to an arbitration proceeding. *See Sturdivant v. Seaboard Serv. Sys.,* 459 A.2d 1058, 1059–60 (App.D.C.1983).

In *Mazanderan,* the Court held that the appellee's letter to the Public Vehicles Division of the D.C. Department of Mass Transportation complaining about the allegedly abusive behavior of appellant, a taxi driver, was absolutely privileged. In that case, the appellee's letter "served as a formal complaint against appellant, as a result of which the Hacker's License Appeal Board conducted a hearing." 490 A.2d at 181. Copies of the letter were also sent to the Immigration and Naturalization Service ("INS") (as the letter also raised a question about the driver's immigration status), and to a District of Columbia police officer who had been called to the scene of the incident. The Court held that "publication by copy to the police officer and the INS was also absolutely privileged." *Id.* The Court finds that applying the principles set forth in *Mazanderan* to the facts of this case, the FOP's letters to the Mayor and the United States Attorney are absolutely privileged.

Plaintiff argues that the *Mazanderan* case is inapposite because communications concerning alleged misconduct of a police officer to his superior under District of Columbia law, are entitled to only qualified privilege. Plaintiff refers the Court to *Mosrie v. Trussell,* 467 A.2d 475 (App.D.C. 1983), in support of this proposition.

The Court notes, on one hand, that the reach of *Mazanderan* is broad and that District of Columbia law has greatly expanded the communications which are protected by an absolute privilege. On the other hand, however, the Court is hesitant to expand the scope of an absolute privilege beyond the reach of decided case law. The Court finds it unnecessary to resolve the question of absolute privilege because the Court determines that the letters are entitled to at least a qualified privilege under *Mosrie* and because the Court finds

that plaintiff cannot defeat the qualified privilege in this case.

■■■ In addition to the privilege recognized in *Mosrie,* the Court also finds another important common law privilege to be implicated in this case—a publisher's privilege to act in his own interest. The undisputed facts in this case establish plaintiff clearly was afforded opportunities and courtesies which were not being afforded to other individuals whose urine tested positive, regardless of whether plaintiff was aware that he was being afforded these opportunities. The FOP, therefore, had a legitimate interest in bringing the disparate treatment of police officers to the attention of one with authority to correct the problem.

It is well-established that this common law privilege is lost if the publisher says "more than reasonably appears to be necessary, or if the publication is made to a person who apparently is in no position to give legitimate assistance...." *Prosser on Torts* § 115 at 826 (footnotes omitted). The Court is satisfied that the letters state only that which reasonably appears to have been necessary. That the letters relate the events surrounding plaintiff's urinalysis testing in detail demonstrates only that FOP showed concern for accuracy. The Court also finds that publication to the United States Attorney for the District of Columbia and the Mayor of the District of Columbia was proper, particularly where the publisher was concerned that corruption within the Police Department extended to the highest ranks.

■■■ The defense of qualified privilege is lost if the plaintiff can demonstrate malice. *Mosrie v. Trussell,* 467 A.2d at 477. "With respect to malice as it relates to qualified privilege in the area of libel, 'all definitions come down to the equivalent of bad faith.'" *Ford Motor Credit Co. v. Holland,* 367 A.2d 1311, 1314 (App.D.C. 1977) (quoting *H.E. Crawford Co. v. Dun & Bradstreet, Inc.,* 241 F.2d 387, 395 (4th Cir.1957)). "Put another way, a qualified privilege exists only if the publisher believes, with reasonable grounds, that his statement is true." *Mosrie,* 467 A.2d at

477. The Court finds that where, as here, the facts contained in the publications are admitted to be true, the plaintiff is unable as a matter of law to defeat the qualified privilege asserted by the defendant.

The plaintiff's arguments to the contrary, viewed in the light most favorable to plaintiff, suggest the existence of ill will on the part of FOP. *See* Plaintiff's Memorandum of Points and Authorities in Opposition To Defendant Fraternal Order of Police's Motion to Dismiss at 8–11 and 22–23. The law in this jurisdiction, however, is that "the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose." *Mosrie*, 467 A.2d at 477.

### B. *Post/NBC*

■ The Post and NBC also argue that their reports were privileged. These defendants set forth two theories of privilege: first, a common law privilege to publish reports of official governmental proceedings; and second, the First Amendment privilege of neutral reportage. This Circuit, to date, has neither adopted nor rejected the latter privilege which was articulated in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). *See Ollman v. Evans*, 750 F.2d 970, 989 n. 39 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Because resolution of the latter issue is not essential in this case, the Court presently considers only whether the media defendants' reports are privileged under the former doctrine.

The common law rule in this jurisdiction is that "[t]he law affords no protection to those who couch their libel in the form of reports or repetition.... [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement." *Olinger v.*

*American Savings and Loan Ass'n*, 409 F.2d 142, 144 (D.C.Cir.1969) (per curiam).

Because of the hostility of this rule to the interests fostered by the First Amendment, an important exception has been recognized. In *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287 (D.C.Cir. 1988), the Court stated:

> To ameliorate the chilling effect that the republication rule would have on the reporting of controversial matters of public interest, common law courts, including those of the District of Columbia, recognize a privilege for fair and accurate accounts of governmental proceedings. *See Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88–90 (D.C.1980), *cert. denied*, 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). Following the *Restatement*, the District of Columbia common law abandons the concept of "adoption" where a report of an official proceeding is "(a) accurate and complete, or a fair abridgement of what has occurred, and (b) published for the purpose of informing the public as to a matter of public concern." *Phillips*, 424 A.2d at 88 (quoting *Restatement (Second) of Torts* § 611 (1977)).

*Id.* at 1299.

This jurisdiction has interpreted broadly what constitutes an official proceeding. In *Phillips*, the Court stated:

> [T]he privilege has been held applicable to reports of proceedings before any court, or agency of the court ..., reports of any other proceedings, judicial in character, which take place before administrative, executive or legislative bodies ..., and to reports of action by legislative bodies and reports of bodies which are by law authorized to perform public duties ..., as well as *reports of any official proceeding or action taken by any officer or agency of government.*

424 A.2d at 88 (emphasis provided). The Court finds that the Cox Committee's investigation constitutes an "official proceeding" for the purposes of considering the applicability of this privilege.[25]

---

**25.** As discussed in Part II, *supra,* the Court finds that the subject matter of the Post articles and the NBC broadcast was the circumstances surrounding plaintiff's prepromotion urine testing and the Cox Committee's investigation.

Some dispute also surrounds the issue whether the scope of the privilege necessarily extends to permit publication of the facts that prompted the Cox Committee to be convened in the first place. Defendants the Post and NBC argue that the scope of the privilege clearly extends to publication of the allegations set forth in the FOP's letters under *Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (App.D.C.1970). Plaintiff argues, to the contrary, that the allegations contained in the FOP letters were not technically part of the investigation and that therefore no privilege exists to publish the allegations in the letters.

The Court finds that the scope of the privilege does extend to include publication of the allegations in FOP's letters, but not for the reason asserted by the defendants. The Court finds that the *Johnson* case is not directly on point here. In *Johnson*, the Court held that a publication which fairly and accurately republished the allegations set forth by the appellant's wife in a complaint for divorce is entitled to a qualified privilege. 271 A.2d at 698–99. However, that case must be viewed in light of the principle that judicial proceedings, including the complaint which initiates them, are protected by an absolute privilege under common law. *See Prosser on Torts* § 114. Here, the FOP letters have not been determined to be entitled to an absolute privilege.[26]

Nonetheless, the Court must reject plaintiff's argument that the scope of the privilege in this case does not include the privilege to report the allegations set forth in the FOP's letters. First, the Court finds it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding. Second, the Court finds that wholly apart from the Cox Committee investigation, the letters fall within the scope of the privilege because they involve action taken by an officer of the government. Undoubtedly, Officer Richardson is an officer of the government. Under *Phillips*, therefore, reports about his action in bringing questions of official misconduct to the attention of the FOP are clearly privileged. *See* 424 A.2d at 89 (District of Columbia courts have repudiated the "official act" requirement for the privilege to apply).

The Court also finds that the Post articles and the NBC broadcast were "published for the purpose of informing the public as to a matter of public concern." To determine whether the Post reports and the NBC broadcast are privileged, therefore, the Court must consider whether these publications were accurate and complete, or a fair abridgement of what occurred.

■ As discussed in Part III B., *supra*, the Court finds the articles and the broadcast to be substantially accurate and complete. As above, plaintiff argues that the failure of the defendants to publish information about the reliability of the EMIT test at the Police and Fire Clinic and the failure of some of the Post articles to state that plaintiff's first urine test was unconfirmed, render the publications inaccurate and incomplete. For the same reasons discussed previously, the Court must reject these arguments. Comparing the allegations in the FOP letters to the allegations set forth in the Post articles and the NBC broadcast, the Court finds the articles and broadcast contained "fair and substantially correct repetition[s] of these allegations...." *Johnson v. Johnson Publishing Co., Inc.*, 271 A.2d 696, 698 (App.D.C. 1970).

One final consideration involves whether this privilege is qualified, and if so, whether plaintiff may be able to defeat the privilege by a showing of malice. The Post and NBC contend that under District of Columbia law, fair and accurate reports of official government proceedings are absolutely protected. *See* Memorandum of Points and Authorities in Support of the Motion of Defendants The Post and NBC to Dismiss at 13–14 and Reply Memorandum in Support of Motion of The Post and NBC to Dismiss at 10–12. Plaintiff contends that the privilege is qualified and can be over-

26. As discussed above, the Court found it unnecessary to resolve the issue whether *Mazanderan*

provided FOP with an absolute privilege under the facts of this case.

come by a showing of actual malice. Plaintiff's Memorandum in Opposition to Motion of the Post and NBC to Dismiss at 11.

The Court finds the law on this issue to be unsettled in this jurisdiction. The question presented is one of state law. The Court looks, therefore, to the most recent decision of the District of Columbia Court of Appeals addressing the subject. In *Phillips*, 424 A.2d 78 (App.D.C.1980), the Court of Appeals characterized the privilege to report on official proceedings as a "qualified privilege." Although the Court's characterization was dictum, previous decisions of that Court have held squarely that the privilege is qualified. *See Johnson v. Johnson Publishing Co., Inc.*, 271 A.2d 696, 698 (App.D.C.1970) ("If the publication fairly and accurately repeats the wife's assertions as contained in the complaint, the defense of *qualified privilege* is available to appellee *absent proof that the article was published with malice.*" (emphasis provided)).

The media defendants premise their argument on two cases, *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C.Cir.1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986), and *Dowd v. Calabrese*, 589 F.Supp. 1206 (D.D.C.1984), and on the *Restatement of Torts* § 611. The Court finds *Dameron* to be consistent with *Phillips*. Indeed, the Court states in *Dameron* that "[t]here is no question that, as a matter of District of Columbia law, publications do enjoy a *conditional* fair report privilege." *Id.* at 739 (citing *Phillips*) (emphasis provided). The Post and NBC rely on the following language in *Dameron:*

Thus, if the reports are "'garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made,'" or if the reports are unfair or inaccurate, the privilege does not apply and the publisher is subject to liability.

*Id.* at 739 (citations omitted). The Court reads this language to describe the circumstances in which the privilege is not properly invoked at the outset. If the plaintiff can demonstrate that the report is unfair or inaccurate or not based on the action of a government official, the privilege is unavailable.

The Court notes, however, that the *Dowd* decision, 589 F.Supp. 1206, 1217, in that it finds an absolute privilege if the publication is a fair and accurate report of an official publication, goes further than *Dameron*, which held such a publication conditionally privileged. 779 F.2d 736, 739.[27]

The Court finds that definitive resolution of this difference is not required to dispose of this case. Regardless of whether the law regards the privilege as absolute or qualified, defendants must prevail in this case. As discussed previously, the overwhelming majority of the facts in the articles and the broadcast are conceded to be true. The Court determined that the failure of three of the articles to indicate the results of the confirmatory test performed on plaintiff's first urine sample, considered in the overall context of the articles, was not a significant omission. It did not render the articles, as plaintiff contends, functionally false. The Court also determined that the Post and NBC had no duty to

27. The Court also acknowledges that the *Restatement* view is that "the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." *Restatement of Torts* § 611 comment a. Although the *Restatement* is entitled to great weight, it is not the controlling law unless it has been adopted by the courts in this jurisdiction. *See Prosser on Torts* § 115, at 838 ("substantial judicial authority" exists to the contrary of *Restatement* position).

The Court rejects the contention of the Post and NBC that *Phillips* adopted the *Restatement*

formulation of the privilege. In *Phillips*, the Court stated that "[t]he District of Columbia Courts appear to have later accepted an expansion of the reporting privilege beyond the bounds of strictly judicial proceedings, though possibly not as far as the Restatement indicates. . . ." 424 A.2d at 89. Although this statement refers to the scope of the privilege rather than the privilege's status as absolute or qualified, the language makes it clear that the *Phillips* court did not give wholesale approval to *Restatement* § 611.

disclose data on the reliability of the EMIT test. Therefore, these defendants' awareness or knowledge of such data is irrelevant to the issues before the Court.

The Court finds that because the communications at issue did not contain any "false" information, no amount of discovery could enable plaintiff to demonstrate that these defendants acted with knowledge of the falsity of their statements or with reckless disregard of the truth or falsity of their statements.

## CONCLUSION

The essential facts in this case are not in dispute. The Court finds that defendants are entitled to summary judgment on all counts in this action. Plaintiff's counts for invasion of privacy must be dismissed. The only invasion of privacy tort theory with any factual predicate in plaintiff's complaint is publication of private facts. However, an essential element of that tort—the absence of legitimate public concern—is lacking in this case. Because the Court finds, as a matter of law, that the subject matter of the allegedly defamatory communications is of legitimate public concern, plaintiff's counts for invasion of privacy must be dismissed.

The Court also finds that plaintiff's defamation counts must be dismissed. The Court finds that the FOP letters are not actionable because the facts asserted are true and because the allegedly defamatory statements comprise expressions of opinion. The Court also finds that the letters are not capable of bearing the defamatory meaning ascribed to them by plaintiff. The Court further finds that with respect to FOP, plaintiff is unable, as a matter of law, to establish actual malice as required by *New York Times*. The Court also finds that the Washington Post articles and the NBC broadcast are not capable of being proven false and are not capable of bearing a defamatory meaning.

The Court also finds that the allegedly defamatory communications are not actionable because they are privileged. With respect to the Fraternal Order of Police, the letters are entitled to at least a qualified privilege as communications alleging misconduct of a police officer and as communications in the interest of the publisher. No evidence exists to support plaintiff's contention of bad faith to defeat the privilege in this case. With respect to the Post and NBC, the Court finds the articles and broadcast, respectively, are privileged as reports of official proceedings or action taken by an official of the government. Regardless of whether this privilege is absolute or qualified, defendants the Washington Post and the National Broadcasting Company, Inc. must prevail. Accordingly, the plaintiff's counts for defamation must be dismissed.

## ORDER

Upon consideration of the motion of defendant Fraternal Order of Police to dismiss this case for failure to state a claim and the motion of defendant the Washington Post Company and the National Broadcasting Company, Inc. to dismiss this case for failure to state a claim, the memoranda in support thereof and in opposition thereto, the oral arguments presented by counsel in open court, the entire record herein, and for the reasons stated in the accompanying memorandum, it is by the Court this 16th day of February, 1989,

ORDERED that defendants' motions to dismiss shall be treated as motions for summary judgment pursuant to Rules 12(b) and Rule 56 of the Federal Rules of Civil Procedure; and it is further

ORDERED that the motion of defendant Fraternal Order of Police for summary judgment be, and hereby is, granted; and it is further

ORDERED that the motion of defendants the Washington Post Company and the National Broadcasting Company, Inc. for summary judgment be, and hereby is, granted; and it is further

ORDERED that the complaint be, and hereby is, dismissed as to all counts.